## Commonwealth *v.* Raymond, Appellant.

196

Argued April 16, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Cecil B. Moore,* for appellant.

*Richard A. Sprague,* Assistant District Attorney, with him *William H. Wolf, Jr., Stanley M. Shingles* and *Arlen Specter,* Assistant District Attorneys, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 9, 1963:

The defendant, Albert Edward Raymond, after trial was convicted by a jury of murder in the first degree. The punishment was fixed at death. Following dismissal of motions for a new trial and in arrest of judgment, sentence was imposed in accordance with the jury's verdict. This appeal followed.

Despite the fact that the motion in arrest of judgment was not pressed on appeal, we have carefully examined the record as required by the Act of February 15, 1870, P. L. 15, 19 P.S. §1187, and find that the evidence is more than ample to sustain the conviction. All of the ingredients of murder in the first degree were established beyond a reasonable doubt. Our discussion herein, therefore, will be restricted to the alleged trial errors, which the defendant urges require a new trial.

The factual history may be summarized as follows:

William Powell, an officer of the Philadelphia Police Department, while in plain clothes met Raymond, the defendant, in the early morning hours of November 19, 1960, in a bar near 9th and Vine Streets in the City of Philadelphia. The two left together and proceeded to a house at 449 Marshall Street looking for two known prostitutes. Upon entering the dimly lit

hallway of the house, a fight occurred between Powell and Raymond, during which Powell was shot and fatally wounded. His body was dragged a few minutes later by Raymond and two companions to Powell's automobile located a block away and dumped into the back seat, where it was found by the police later the same morning. The autopsy disclosed the existence of numerous injuries, including a broken jaw and a fractured skull. Death was caused by a bullet wound, the missile entering the body through the left rear portion of the neck.

The defendant was almost immediately the subject of a widespread police search. It continued unsuccessfully for eleven days. During this time, the defendant was in hiding in another section of the city. On November 30, 1960, he telephoned the office of a local newspaper and arranged to surrender to the police.

At trial, the Commonwealth contended that on the occasion involved, Powell was investigating vice violations, and that Raymond, unaware of this, lured him from the bar to the Marshall Street address for the purpose of robbing him.

The defendant testified that while he was walking along the street, Powell, whom he did not know, drove up in a car, accosted him and asked to be "fixed up"; that in consideration "for a couple of dollars" he accompanied Powell to the Marshall Street address looking for two girls; that he told Powell the girls were not home; that Powell, who appeared to have been drinking, became provoked and abusive, punched him, pulled a gun and threatened to shoot him; an altercation followed and in an effort to protect himself he grabbed Powell's hands by the wrists and was attempting to push the gun away from himself, when it was accidentally discharged. He also denied any plan to rob Powell or that such had occurred.

In order to sustain its contention that the defendant schemed to rob Powell, the Commonwealth during

its case in chief offered the testimony of one Osyp Sudomlak. He stated that on November 12, 1960, exactly one week before the Powell killing, he met the defendant in a bar at 7th and Spring Garden Streets in Philadelphia and, under the pretext of obtaining a girl for immoral purposes, had been lured by Raymond to the same house at the Marshall Street address, where he had been assaulted and robbed. This testimony was corroborated by a female, who acted in concert with Raymond on this occasion.

It is argued that this evidence of an independent crime was inadmissible. We cannot agree. It was relevant for the proffered purpose. It has long been established that proof of the commission of a crime of the same nature, not too distant in time, may be admitted to show plan, scheme, motive and design: *Commonwealth v. Wendt*, 258 Pa. 325, 102 A. 27 (1917); *Commonwealth v. Weiss*, 284 Pa. 105, 130 A. 403 (1925); *Commonwealth v. Burdell*, 380 Pa. 43, 110 A. 2d 193 (1955); *Commonwealth v. Wable*, 382 Pa. 80, 114 A. 2d 334 (1955). The circumstances surrounding the Sudomlak assault and robbery and the present case were so very close in nature and time as to bring the situation within the rule. This is particularly true herein in view of the defendant's statement that he accompanied Powell to the Marshall Street address for purposes other than robbery.

To further establish the defendant's connection with the Sudomlak robbery, the Commonwealth offered the testimony of a police officer, Joseph Hunt, who was assigned to try to apprehend the defendant. He related that in company with other officers, he visited the home of one Mary Shockley, a cousin of the defendant, on November 19, 1960, at about four o'clock p.m., looking for the defendant. It had been established earlier by the testimony of Miss Shockley that the defendant had stayed on occasions at her home and slept

in a certain bedroom, and that he had done so on Thursday night, November 17, 1960. Hunt testified that he searched this bedroom in the presence of Miss Shockley, and found in a bureau drawer a wallet containing social security and other personal cards of Sudomlak, which had forcibly been taken from him during the robbery on November 12th. It is asserted that this search was made without a warrant, that it was illegal, and that any evidence relating thereto should have been excluded under the doctrine of *Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684 (1961).

*Mapp* ruled that all evidence obtained by search and seizure in violation of the United States Constitution is inadmissible in a state court. The search and seizure in this case, as well as the trial and verdict, preceded *Mapp.*[1] Regardless, *Mapp* is of serious import. The law to be applied on direct appeal, under the circumstances presented, is that in existence as of the date of appellate decision. See, *Commonwealth ex rel. Wilson v. Rundle,* 412 Pa. 109, 194 A. 2d 143 (1963); *People v. Loria,* 10 N.Y. 2d 368, 179 N.E. 2d 478 (1961); *People v. O'Neill,* 11 N.Y. 2d 148 (1962); *State v. Smith,* 37 N.J. 481, 181 A. 2d 761 (1962); *Commonwealth v. Spofford,* 343 Mass. 703, 180 N.E. 2d 673 (1962); and, The Retroactive Effect of an Overruling Constitutional Decision: Mapp v. Ohio, 110 U. Pa. L. Rev. 650 (1962). However, we do not agree that the present record justifies the conclusion that the defendant can complain of the search or that the evidence was illegally seized.

The owner and person in possession of the premises searched was a cousin of the defendant. The latter did not reside therein. He did not rent the room in-

---

[1] Mapp was decided on June 19, 1961. The present search and seizure occurred on November 19, 1960. The trial took place in May 1961, and the verdict rendered on May 12, 1961. However, the judgment of sentence was not entered until May 31, 1962.

volved or have any authority over it, except when he was there. At the time of search none of his clothing or other property was there. As of that time, he had for all practical purposes "vacated" it and "abandoned" the evidence seized. His regular residence was in his mother's house at another address. According to the testimony of Miss Shockley, as well as his own, he merely slept there occasionally and never more than one night at a time. The room was used at other times by Miss Shockley's daughter. This room, therefore, was not a place where he can claim the constitutional immunity from search and seizure: *Abel v. United States*, 362 U.S. 217 (1960).

It may appear at first blush that *Jones v. United States*, 362 U.S. 257 (1960), and *United States v. Jeffers*, 342 U.S. 48 (1951), rule to the contrary. Both are distinguishable.

In *Jones*, the defendant was present in the apartment searched at the time thereof and his presence therein was with the permission of the owner. At the relevant time, he was in possession.

In *Jeffers*, the police entered a hotel room without a warrant and without permission. The room was regularly occupied and paid for by two women, who had given a key to the defendant and authority to use it at will, which he did often for various reasons. For all practical purposes, he, too, was in possession thereof at the time of search. This is not the present case.

In view of the above conclusion, it is unnecessary for us to reach the question of whether or not Miss Shockley permitted the search, and if so its impact on the defendant's standing to complain.

However, other salient circumstances, albeit unnecessary to the decision should be noted.

The record does not show that the search involved was made without a search warrant. This allegation appears in counsel's brief. Further, the testimony re-

lating to the search and the evidence revealed thereby were admitted in evidence without objection on the ground now asserted.

It appears from an examination of the record that after Hunt testified without any objection to the search, finding of the wallet and identifying the enclosed cards, counsel belatedly said, "May it please the court, the objection we made in chambers will apply here?" To which the court replied, "Yes, that is right." A further examination of the record as to the objection referred to as made in chambers discloses that this was entered to the testimony of the witness, Miss Shockley, and stated only that the Commonwealth had no right to introduce any evidence relating to the commission of the Sudomlak crime on the premise that it was unrelated and independent. It was a specific and not a general objection. The reason given for exclusion was not valid, as we have pointed out previously. Nothing was said or no objection voiced as to the legality of the search. In the cross-examination of Hunt, the questions did not in any way refer to the legality of the search. It was not even hinted that the legality was questioned. Also, there was no request to suppress this evidence before or during the trial.[2]

It has long been the rule in this state that if the ground upon which an objection to testimony is based is specifically stated, all other reasons for exclusion are waived. *Commonwealth v. Markwich,* 178 Pa. Superior Ct. 169, 113 A. 2d 323 (1955) ; *Messmore v. Morrison,* 172 Pa. 300, 34 A. 45 (1896) ; *O'Toole v. Post Printing and Publishing Co.,* 179 Pa. 271, 36 A. 288

[2] The admission of this evidence was not even included in the assignments of error in defendant's written motion for a new trial. However, since it was advanced at oral argument in the court below, and considered by the court in evaluating the motion this lapse is not considered in the decision.

(1897); *Walker v. Walker*, 254 Pa. 220, 98 A. 890 (1916); *Pennsylvania Co. v. Phila. Electric Co.*, 331 Pa. 125, 200 A. 18 (1938). Generally, objections to evidence not entered at trial may not be urged on appeal or even at argument for a new trial below: *Danley v. Danley*, 179 Pa. 170, 36 A. 225 (1897); *Pennsylvania Co. v. Phila. Electric Co.*, supra.

In his testimony, the defendant categorically denied the Sudomlak affair. In rebuttal, the Commonwealth offered the testimony of one John Bright, an employee of the Pennsylvania Parole Board, who interviewed the defendant while he was confined to prison awaiting trial in this case. He stated that, during their conversation the defendant admitted robbing Sudomlak, related how he had hit him on the head with an iron pipe and stole money from his person in the hallway of the Marshall Street address.

It is contended by the defendant that the admission of Bright's testimony violated his constitutional rights against self-incrimination, and also that his statements against interest were gained in the absence of his counsel and under such circumstances that their use against him at trial constituted a denial of due process of law. We cannot agree.

The evidence was relevant to refute the defendant's testimony at trial. His admissions in connection therewith, if freely and voluntarily given, were properly admitted for the jury's consideration. The question of voluntariness was the controlling and determinative factor. In view of all of the attending circumstances, we are convinced that this question was for the jury. See, *Commonwealth v. Ross*, 403 Pa. 358, 169 A. 2d 780 (1961).

The defendant maintains that his admissions to Bright were coerced and not the unconstrained choice of the maker. This posit is based solely upon the premise that Bright's role and apparent power as a

parole officer frightened Raymond into sayings things against interest. There isn't an iota of evidence to show that any "grilling" occurred. Raymond knew Bright's identity and was fully aware of his own right not to talk. The interview was relatively short. No threats, promises or inducements were offered. Raymond talked in a free and spontaneous manner in a calm and informal atmosphere. It would require an extended stretching of the imagination to conclude that any "overborneing of the will" existed.

The fact that the defendant was in prison at the time that these admissions were made does not per se negate the presence of voluntariness or destroy their admissibility: *Commonwealth v. Graham,* 408 Pa. 155, 182 A. 2d 727 (1962); *Lisenba v. California,* 314 U.S. 219 (1941), and *Culombe v. Connecticut,* 367 U.S. 568 (1961). Nor does the fact that Bright was a Commonwealth officer, in itself have any such effect: *Commonwealth v. Eagan,* 190 Pa. 10, 42 A. 374 (1899); *Commonwealth v. Bryant,* 367 Pa. 135, 79 A. 2d 193 (1951), cert. den. 71 S. Ct. 1007, 341 U.S. 954 (1951); *Lyons v. Oklahoma,* 322 U.S. 596 (1944). These factors were for the jury's consideration, together with all of the attending circumstances, in resolving the "free choice" question.

Nor are we persuaded that the interview by Bright in the absence of defendant's counsel constituted a violation of his constitutional rights and deprived him of effective use of counsel. Admittedly, an indictment had already been returned against the defendant by the grand jury. Likewise, Bright visited the defendant, at the instance of the prosecuting officers, for the purpose of gaining information to help secure a conviction in the present case. By the same token, the defendant never requested the presence of his attorney, who had previously warned him not to talk. There was no request that he be summoned. If Raymond

desired to talk in the absence of his lawyer, it was not the obligation of the Commonwealth to gag him or act as his guardian. See, *U. S. ex rel. Crump v. Sain,* 295 F. 2d 699 (7 Cir. 1961). Certainly, if these admissions were spontaneously made to a fellow prisoner, their admission would be beyond question. If the Commonwealth planted the witness in the cell with the defendant to listen for such conversation, the Commonwealth's "cooperation" would not in itself invalidate the admissibility.

We are fully aware that in a capital case the defendant has an absolute right to counsel and that this is not restricted to the trial proceedings. See, *Powell v. Alabama,* 287 U.S. 45 (1932). We also recognize that the questioning of a defendant after indictment in the absence of counsel, when the presence of counsel has been requested, has been condemned. See, *Spano v. New York,* 360 U.S. 315 (concurring opinion 1959), and *People of the State of New York v. Di Biasi,* 7 N.Y. 2d 544, 166 N.E. 2d 825 (1960). But, the present case is not within the same area. The circumstances are saliently different.

It must also be noted that the admissions involved did not relate to the crime for which Raymond had already been indicted. As to the Sudomlak robbery, he was only a suspect. Further, Bright's testimony was cumulative. Raymond's involvement in the robbery had already been established during the Commonwealth's case in chief, by the testimony of the victim of that crime, and the female who acted in concert with Raymond.

We cannot subscribe to the position that since the defendant had already engaged counsel, any statements made in the absence of such counsel, regardless of the circumstances, cannot be used against him. The absence of counsel in a case as here presented is

just another factor to be considered in resolving the question of voluntariness.

It is argued that the calling of Bright, the parole officer, as a witness, rendered it quite obvious to the jury that the defendant had a prior criminal record, and resulted in serious prejudice. The Commonwealth in its examination of this witness assiduously refrained from disclosing to the jury the nature of his employment, or the reason for his interview with the defendant. If any prejudicial facts or inferences were brought to light, it was clearly accomplished only in defense counsel's vigorous cross-examination. He cannot now be heard to complain of that for which he alone is responsible.

The defendant argues that the evidence was insufficient to warrant the submission of the felony-murder rule for the jury's consideration. This contention is without merit. The evidence was adequate to lead to the conclusion that the victim in the present case was led to the scene for the purpose of robbery, just as was Sudomlak a few days previously. The commission of a very similar and related crime by the defendant a week before, plus the disappearance of Powell's wrist watch and gun following the assault in the instant case, were more than sufficient to justify the conclusion that a robbery was planned and committed.

The defendant complains that the use of color slides at trial, showing the body of the deceased, was highly prejudicial and precluded a fair trial. These exhibits were properly admitted to show the nature of the wounds and the severity and violence of the assault. There was no "overuse" and the fact that the exhibits were not pleasant to the eye did not in itself require their exclusion: *Commonwealth v. Johnson*, 402 Pa. 479, 167 A. 2d 511 (1961); *Commonwealth v. Dickerson*, 406 Pa. 102, 176 A. 2d 421 (1962).

The defendant also complains that members of the negro race were excluded from jury service in the case and this constituted lack of due process. This is without merit. Admittedly, several negro jurors were in the panel. The Commonwealth saw fit to challenge peremptorily many individuals of varied races, religions and backgrounds. In several instances, these were members of the negro race. This the Commonwealth had every right to do. It was not a systematic exclusion of any one group. The fact that the Commonwealth saw fit to exclude from service several negroes as well as whites by way of peremptory challenge, did not constitute a denial of due process. See, *Commonwealth ex rel. Ashmon v. Banmiller*, 391 Pa. 141, 137 A. 2d 236 (1958), cert. den. 356 U.S. 945 (1958).

The defendant also complains that the trial judge in his instructions to the jury unfairly expressed his opinion as to defendant's guilt and thus precluded a fair and impartial verdict. The portion of the charge concerned was as follows: "Now, I am making a comment, I think it would be a miscarriage of justice if you found this defendant not guilty, because I think in my reasoning and in my circumstances, as I have thought them out and reasoned them out, that I should and do have a right to make this comment. *But please remember* that in the last analysis it is *entirely* and *completely* and *finally* for you to say whether it should be murder in the first degree, murder in the second degree, voluntary manslaughter, or not guilty. . . . *It is entirely up to you,* members of the jury. You have seen everybody, you have heard everything; you have seen the demonstration, you have seen the exhibits, you have seen the maps, you have heard everything, and you have been very attentive. Use your heads, think it out, and then come out with one of these *four* verdicts." (Emphasis added.)

A trial judge has every right to express his opinion as to the weight of the evidence, or even the guilt or innocence of the accused, provided it is done fairly and temperately, and provided further that he leaves the ultimate decision to the jury and does not interfere with its responsibility: *Commonwealth v. Simmons,* 361 Pa. 391, 65 A. 2d 353 (1949); *Commonwealth v. Thompson,* 367 Pa. 102 79 A. 2d 401 (1951); *Commonwealth v. Bibalo,* 375 Pa. 257, 100 A. 2d 45 (1953); and, *Commonwealth v. Cisneros,* 381 Pa. 447, 113 A. 2d 293 (1955).

In the instant case, the trial judge *on a total of nine separate occasions,* in clear and understanding language, emphasized that the question of the defendant's guilt or innocence was for the jury and the jury alone to decide and that he nor anyone else could dictate its verdict. This assignment of error is without a semblance of merit.

The defendant complains that the trial court improperly excluded the testimony of Powell's wife to prove the existence of certain undesirable traits of character in the decedent. Counsel misconstrued the court's ruling. There was no blanket prohibition against the use of her testimony. What the court did exclude, and properly so, was any reference to and the introduction into the evidence of the record of a prior divorce proceeding between the parties. The court allowed other witnesses to testify that the decedent was a man of immoral habits and violent temper, and never indicated or ruled that the decedent's wife could not testify in the same vein.

Other assignments of error challenge the correctness of the court's rulings in refusing a continuance of the trial to permit additional time for preparation (the trial did not begin for more than five months after the arrest); in not sequestering all witnesses for the Commonwealth for the entire trial; in not ordering

the withdrawal of a juror because of alleged inflammatory argument of the district attorney and newspaper articles in the public press; in refusing to permit certain questions to be asked prospective jurors on their voir dire and in refusing to allow the jurors to view the premises where the killing occurred. All of these rulings by the trial judge involved the exercise of a fair and wise discretion. The record discloses no abuse thereof.

Finally, the defendant asserts that the entire atmosphere and conduct of the trial was unfair and prejudicial. This is merely a shotgun approach, which a reading of the record belies. The trial was presided over by an able and experienced judge, who fairly and judiciously protected the defendant's rights.

We have carefully considered each and every assignment of error. The record discloses nothing that warrants a retrial. Those not specifically discussed herein have been adequately and correctly answered in the opinion of the court below.

Judgment affirmed.

Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In his charge to the jury in this case, the trial judge said: "I think it would be a miscarriage of justice if you found this defendant not guilty, because I think in my reasoning and in my circumstances, as I have thought them out and reasoned them out, that I should and do have a right to make this comment."

The Majority Opinion finds nothing wrong in this statement because the judge told the jury that it was up to them to decide whether the defendant was guilty or not. The Majority repeats the oft-quoted rule that: "A trial judge has every right to express his opinion as to the weight of the evidence, or even the guilt or

innocence of the accused, provided it is done fairly and temperately, and provided further that he leaves the ultimate decision to the jury and does not interfere with its responsibility."

But this rule, even as stated by the Majority, carries within it a very important modification; namely, that the judge must express his opinion *"fairly and temperately."* The judge there did not express himself "fairly and temperately." Metamorphically he held a whip over the heads of the jury. He told them that if they did not agree with him, their contrary view would amount to a "miscarriage of justice." This kind of language, it seems to me, smacks of coercion. A juror may not mind disagreeing with a judge on factual matters but he would dislike very much placing himself in the category of a person who has participated in a miscarriage of justice, judicially proclaimed.

The crime committed by the defendant here was abhorrent and lacked a single mitigating feature. The jury did not need to be bludgeoned into doing its obvious duty. What I find regrettable about the Majority Opinion is that it will be quoted in cases where the guilt of the defendant is not so clear as it is in this case. In consequence, the principle of *reasonable doubt,* which has been undergoing considerable punishment during the last several decades, will soon be whimpering into the umbrageous region of the neglected, and may continue to slide until it finally disappears into the dark sea of oblivion.

The Majority says that the judge on nine occasions told the jury that they were to decide the facts. He could have told them this a hundred times but those feathery words would never whittle down the towering mountain peak of admonition that if they did not accept his conclusion they would be perpetrating a miscarriage of justice.

The Majority treats all this, I say with respect, rather cavalierly and ends up with hand-dusting finality that the "assignment of error is without a semblance of merit." I find that the assignment of error has more than a semblance of merit. In fact, it proclaims with strident voice and complaining drums that the defendant's rights to a trial by jury, as constitutionally guaranteed, were signally violated. I am sorry that the Majority did not hear the tumult.