## Commonwealth *v.* Ross, Appellant.

36

Argued October 7, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Thomas A. Harper,* with him *Utterback and Brown,* for appellant.

*Samuel Strauss,* Assistant District Attorney, with him *Martin Lubow,* Assistant District Attorney, and *Edward C. Boyle,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, November 12, 1963:

Bernard Ross, the appellant, was indicted for the murder of Mrs. Eva Mae Boston. He was convicted of murder in the first degree and sentenced to death. He then filed a motion for a new trial which was denied. Thereafter he appealed to this Court.

Appellant contends that the lower Court committed three reversible errors: (1) the admission of certain parts of the pathologist's testimony, (2) failure to re-

quire the jury to hear and consider "penalty" evidence *immediately* after finding a verdict of murder in the first degree, and (3) charging the jury as to the factors to be considered in fixing the penalty.

## The Evidence

The evidence, considered in the light most favorable to the Commonwealth, may be summarized as follows:

The appellant and the decedent, Mrs. Eva Mae Boston, commenced living together in 1954, although each was married to someone else. Their meretricious relationship continued until at least September of 1961 when the appellant left their common abode. At the time the appellant and the decedent began living together, Mrs. Boston had three sons. Subsequently she had two daughters, of whom appellant was apparently the father. After 1961 appellant continued to visit Mrs. Boston nearly every morning, although he no longer resided with her. Violent quarrels frequently occurred during these visits. On a number of these visits appellant threatened to kill Mrs. Boston and some or all of her children. Russell Boston, aged 14, one of decedent's sons, testified that on one occasion his brother, Daniel, aged 17, stepped between his mother and appellant when they were fighting and the appellant threatened him with a knife. On another occasion when appellant was fighting with Mrs. Boston, Daniel threatened to call the police. At that time appellant pulled out a gun and threatened Daniel with it.

Edward Alford testified that appellant told him three or four months prior to the shooting that he was going to kill Mrs. Boston. Marion Hamons testified that she saw appellant the night before the murder and he showed her a loaded gun which he said he carried all the time. Blanche Nash testified that the night

before Mrs. Boston was killed, the appellant pulled out a gun and said, "I got something to do with this gun and it will be sooner than they think."

On November 10, 1962, the night before the murder, defendant threatened to kill Mrs. Boston and displayed a loaded pistol. On the morning of November 11, appellant came to Mrs. Boston's apartment and began quarreling with her. Daniel told appellant to leave. Appellant then said, *"I am going to kill all of you."* Thereupon appellant pulled out a gun and shot Daniel Boston in the chest, when he was only three feet away. Appellant then wheeled around and shot Daniel's brother, Russell, in the side near the heart.

John Gressen, aged 16, who was a friend of the Boston children, witnessed the two shootings. He testified that he saw defendant go into Mrs. Boston's bedroom and he then ran for help. When the police arrived, they found Mrs. Boston's dead body on the floor in the bedroom. She died of a bullet wound which went through her left forearm and pierced her heart and lungs. Although Russell miraculously recovered, Daniel died on the way to the hospital. When the police arrested appellant he freely admitted that he shot Mrs. Boston as well as her two sons.

The Commonwealth called a pathologist who was permitted, over objection, to testify that he performed an autopsy upon Daniel Boston and that Daniel died as a result of a gunshot wound. Defendant contends that although it was proper to prove that Daniel was shot just before his mother was shot, it was prejudicial and reversible error to permit any testimony that *Daniel died as a result of this shooting.*

Admissibility of the Pathologist's Testimony

The law is well settled that evidence of the commission of a crime other than the one for which a defend-

ant is being tried is not generally admissible. However, like most rules there exist certain well defined exceptions—for example, when more than one person is killed by the accused either as part of a common plan, design, or motive, or as part of the res gestae or as part of a sequence of acts related to the crime or as part of a chain of criminal acts. *Commonwealth v. Gockley*, 411 Pa. 437, 192 A. 2d 693; *Commonwealth v. Wable*, 382 Pa. 80, 114 A. 2d 334; *Commonwealth v. Williams*, 307 Pa. 134, 160 A. 602; *Commonwealth v. Raymond*, 412 Pa. 194, 194 A. 2d 150; *Commonwealth v. Burdell*, 380 Pa. 43, 110 A. 2d 193; *Commonwealth v. Kline*, 361 Pa. 434, 65 A. 2d 348; *Commonwealth v. Petrillo*, 338 Pa. 65, 12 A. 2d 317; *Commonwealth v. Kluska*, 333 Pa. 65, 3 A. 2d 398.

In *Commonwealth v. Williams*, 307 Pa., supra, the Court said (page 148) : "There are, however, many well recognized exceptions where the commission of another offense by the defendant may be received in evidence. Prior convictions can be admitted in evidence to show intent, scienter, motive, identity, plan, or the accused to be one of an organization banded together to commit crimes of the sort charged, *or that such* prior conviction or *criminal act formed a part of a chain,* or was *one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development of the facts;* * also to prove the mental condition when the defense was insanity, or to rebut the inference of mistake, or to show a guilty knowledge: Com. v. Coles, supra; Com. v. Cicere, 282 Pa. 492; Com. v. Dorst, 285 Pa. 232; Com. v. Quaranta, 295 Pa. 264."

In *Commonwealth v. Gockley*, 411 Pa., supra, the defendant was tried for and convicted of the murder of Smith. Smith and Mrs. Klein disappeared from

---

* Italics throughout, ours.

their respective homes in Reading in March of 1960, but their disappearance was not noted until July of 1960. Defendant testified that Mrs. Klein and Smith came to his home in March of 1960 and lived there together for a few days. At the end of the third day Smith took defendant to another bedroom and showed him Mrs. Klein's dead body and informed him that Mrs. Klein had died of natural causes. Defendant further testified that he then got into an argument with Smith in the course of which Smith threatened him with a shotgun and while he and Smith were struggling for possession of the gun it was accidentally discharged, killing Smith. The Commonwealth was permitted to prove that the body of Smith and of a woman (evidently Mrs. Klein) were found in a common grave* on defendant's property.

We pertinently said (pages 450-451), "The only evidence of another crime which was admitted in evidence was that pertaining to the death or killing of Mrs. Klein and the relationship between her and Smith and the appellant. Even if the evidence as to the death of Mrs. Klein and the relationship between her and Smith and her connection with the defendant had not been part of defendant's confession, such evidence was an inseparable, indispensable and inextricable part and parcel of this case, and because of this fact could not possibly have been separated or eliminated: Brown v. Commonwealth, 76 Pa. 319, 337; Commonwealth v. Wable, 382 Pa. 80, 84, 114 A. 2d 334. Commonwealth v. Wable is on its facts similar to the instant case and aptly states the controlling principle of law . . . .

"There was no error in the admission of evidence concerning the death and burial of Mrs. Klein."

In *Commonwealth v. Wable*, 382 Pa., supra, defendant was indicted and tried for the murder of Pitts

---

* In an advanced state of decomposition.

and was found guilty of murder in the first degree and the penalty fixed at death. The Commonwealth proved that on July 25, 1953, Lester B. Woodward, a truck driver, was murdered while asleep in the cab of his truck on the Pennsylvania Turnpike at a point in Westmoreland County. Three days later, on July 28, 1953, Pitts likewise a truck driver was similarly murdered while asleep in the cab of his truck at a point on the Pennsylvania Turnpike also in Westmoreland County. Three days later, on July 31, 1953, Shepard, another truck driver, was shot while asleep in the cab of his truck on a highway in Ohio at a point approximately 15 miles from the Pennsylvania Turnpike.

Defendant contended that the Court erroneously admitted evidence relating to the murder of Woodward and the shooting of Shepard. Shepard did not die. Woodward and Shepard were robbed; Pitts was not. Defendant was arrested in New Mexico. The bullets that were fired into the three victims were shown to have been fired from the defendant's gun, and Shepard identified defendant as the man who had shot him. This Court held that the testimony relating to the murder of Woodward and the shooting of Shepard was properly admitted and affirmed the judgment and sentence. The Court, speaking through Mr. Chief Justice HORACE STERN, said (pages 84-85) : "It is true, of course, that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime, because the fact of the commission of one offense is not proof of the commission of another. . . . But it is also true that sometimes there exist the 'special circumstances' which operate as exceptions to the general rule, and bring the case within the equally well established principle that evidence of other crimes *is* admissible when it tends to prove a common scheme, plan or design embracing the commission *of two or*

*more crimes so related to each other that proof of one tends to prove the others* or to establish the identity of the person charged with the commission of the crime on trial, . . . . A veritable multitude of authorities in our appellate courts enunciate, albeit in varying language, this familiar principle [citing 21 cases].

"It would seem too clear for discussion that the circumstances surrounding the murders of Woodward and Pitts and the shooting of Shepard brought the present trial within the compass of the exceptions to the general rule. It having appeared that defendant had been involved in the shooting of Shepard and that the same gun had been used in the commission of the other two crimes; that the gun belonged to defendant; . . . and that there was an almost uncanny similarity in all the details of their perpetration;—in the light of such a concatenation of circumstances . . . . The court certainly committed no error . . . in the admission of the testimony relating to the murder of Woodward and the shooting of Shepard."

See to the same effect, *Commonwealth v. Raymond,* 412 Pa. 194, 194 A. 2d 150; *Commonwealth v. Burdell,* 380 Pa. 43, 110 A. 2d 193; *Commonwealth v. Kline,* 361 Pa. 434, 438, 65 A. 2d 348; *Commonwealth v. Petrillo,* 338 Pa. 65, 80, 12 A. 2d 317; *Commonwealth v. Kluska,* 333 Pa. 65, 72, 3 A. 2d 398. In *Commonwealth v. Kluska,* the Court said (page 72) : "For one criminal act to be evidence of another there must be some logical connection between them, *either as constituting parts of one transaction,* or as showing a common motive or some general design or plan: . . . ."

In *Commonwealth v. Burdell,* supra, the Court, speaking through Chief Justice HORACE STERN, said (page 47) : "One of our most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defend-

ant who is being tried for another crime. . . . It is held that such evidence is admissible only where the former alleged crime or crimes are of the same nature as the one under trial and indicate a general intent or design on the part of the accused to conduct, for example, a series of similar robberies, or murders, or sex offenses, or poisonings of persons in order to obtain their insurance money, or the like; in other words, the prior criminal act or acts are evidential only if clearly constituting part of a chain,* system, composite plan or scheme. This is all so well established that it would be but a work of supererogation to point out the many authorities enunciating these principles: . . . ."

We are convinced that the testimony of the pathologist as to the death of Daniel was properly admitted.

### "Penalty" Evidence

On April 25, 1962, at *11:50 A.M.*, the Trial Judge submitted to the jury the question of appellant's guilt or innocence. Almost eight hours later, at 7:30 P.M., the jury returned its verdict of guilty of murder in the first degree. The Court then informed the jury that it was its duty to fix the penalty and asked the members of the jury if they wished to immediately hear evidence pertaining to the penalty or wished to retire for the night and resume their duties in the morning. The members of the jury unanimously indicated their desire to retire for the night, whereupon at 7:45 P.M. Court was adjourned.

---

* Had the fact of Daniel's death not been proved by the Commonwealth it is certainly likely that defendant's counsel would have vigorously argued that the jury was entitled to infer that had the Commonwealth produced him as a witness he would have testified adversely to the Commonwealth's position. Cf. *Piwoz v. Iannacone*, 406 Pa. 588, 596, 178 A. 2d 707; *Peters v. Sheer*, 351 Pa. 521, 41 A. 2d 556; *Hall v. Vanderpool*, 156 Pa. 152, 25 Atl. 1069.

Although defendant made no motion or request to have the jury immediately hear the evidence as to a just penalty, he now contends that the trial Judge erred in not hearing evidence on the question of penalty immediately after the jury's verdict of first degree murder.

Defendant relies upon certain language in *Commonwealth v. McCoy,* 405 Pa. 23, 172 A. 2d 795, where the Court said (pages 34-35) : "The hearing on the question of penalty should be entered upon immediately* following the recording of the jury's verdict, which has found the defendant guilty of murder in the first degree. *Any relaxation in the immediacy of the required hearing on the penalty must necessarily rest in an exercise of sound discretion, in the circumstances, by the trial judge.*** Nor should such discretion be exercised in favor of any postponement *except** for the most urgent of reasons. . . ."

The Commonwealth should not be impaled upon the horns of a dilemma. If the trial Judge or Court permits a jury to hear "penalty" evidence after a very long deliberation as to guilt, or when for any reason they are tired or exhausted or ill, it is an abuse of discretion and amounts to a denial of due process, i.e., the fundamentals of a fair trial, whenever a defendant is convicted. On the other hand, if a jury is permitted or required to hear "penalty" evidence after a dinner or a good night's rest, that constitutes, according to this appellant, an abuse of discretion and a denial of due process. In other words, heads, the defendant wins; tails, the Commonwealth loses.

Such a situation is realistic, not fanciful. In *Commonwealth v. Moore,* 398 Pa. 198, 157 A. 2d 65, the Court said (pages 204-206) : "Defendant next argues

---

* Emphasized in the *McCoy* Opinion.

** Emphasis ours.

that the court erred in keeping the jury together for an unusually long time without opportunity to rest and thus prejudiced the defendant. During the trial the jury had had rooms at the Penn-Harris Hotel. On the last·day of the trial the jurors checked out of the hotel and brought their luggage with them to the courthouse. The jury retired for deliberation on the verdict at 7:08 p.m. after which time the jurors were fed. At 11:15 p.m. the jury requested and were given additional instructions on the various degrees of homicide and, in the words of the trial judge, at that time 'gave no indications of fatigue or illness.' . . . The jury finally reached a verdict at 6:08 a.m.

"Defendant argues that it was reversible error on the part of the trial court to require such extended deliberation without rest for the jurors of whom ten were women. It is very significant that the jurors made no complaint nor any request that their deliberations be suspended and that they be given an opportunity to rest.

". . . If the instant verdict were brought about by any compulsion or if there was anything of record to indicate that the instant verdict was reached because of the jurors' desire for rest and sleep or fatigue we would have no hesitancy in setting such verdict aside. However, the instant record does not disclose such motivation for this verdict. *The extent of time during which a jury is kept together for deliberation is a matter within the discretion of the trial judge; only for an abuse of such discretion should his action be reversed.*"

The trial Judge stated in his Opinion for the lower Court that he ". . . looked down at the jury . . . [and] saw twelve tired and exhausted people . . . ." Under all the circumstances in this case, it is clear that the trial Judge did not abuse his discretion when he acceded to the wishes of the jury and adjourned the trial until the next morning.

## The Judge's Charge

Appellant further contends that the trial Judge erred in charging the jury concerning the factors to be considered in fixing the penalty. The Judge told the jury that in reaching their decision as to whether the penalty should be death or life imprisonment, it might consider but could entirely disregard certain factors set forth in The American Law Institute's Model Penal Code in mitigation or aggravation of the crime. The Judge said: "Now, the American Law Institute, which comprises some of the best legal talent in the country, has suggested certain guide posts for determining the penalty. These are not binding on you. You don't have to pay any attention to them if you don't want to, because you must fix the penalty yourself . . . you are not limited, however, to these factors. You don't have to take them into consideration and you may find other factors that you believe important in mitigation of the crime."

No objection was made to this or to any part of the charge. We have carefully examined the charge and find no abuse of discretion or error of law.

Although appellant did not file a motion in arrest of judgment, we have carefully examined the record as required by the Act of February 15, 1870, P. L. 15, 19 P.S. §1187, and find that the evidence to sustain the conviction and sentence is not only sufficient but is also exceptionally strong and convincing.

Judgment and sentence affirmed.

Mr. Justice COHEN dissents.

------

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

I concur in the able opinion of the Chief Justice. I would add only one observation with regard to the admission of evidence that the defendant had killed another person, in addition to the victim of the homi-

cide being tried. It is to be noted that the defendant specifically declared before he started shooting: "I am going to kill all of you." In view of this statement which plainly indicated that the defendant had formulated a plan to murder a number of persons, including Daniel, the situation here comes within the rule that where there is a plan to commit a series or chain of criminal acts, previous crimes may be testified to.