Commonwealth *v.* Butts, Appellant.

Argued September 18, 1964. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Robert N. C. Nix, Jr.,* for appellant.

*Thomas M. Reed,* Chief Assistant District Attorney, with him *Gordon Gelfond* and *Vincent C. Veldorale,* Assistant District Attorneys, *F. Emmett Fitzpatrick,*

*Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY WRIGHT, J., November 12, 1964:

In the late afternoon of November 27, 1961, on Twenty-First Street in the City of Philadelphia, south of the intersection at Delancey Place, a 1953 Dodge sedan owned and operated by George T. Butts collided with a pedestrian, Romeo Minero, a thirteen year old boy. The Dodge car then struck a 1952 Ford sedan parked at the east curb, forcing it into another parked car. Immediately after the collision the boy's body was found lying on the trunk of the Ford automobile. The boy was taken to Graduate Hospital, where he was pronounced dead on arrival. At May Sessions 1962, the Grand Jury returned three bills of indictment against Butts as follows: Bill No. 329 charged voluntary manslaughter in the first count, and involuntary manslaughter in the second count; Bill No. 330 charged the operation of a motor vehicle while under the influence of intoxicating liquor; Bill No. 331 charged murder. On March 9, 1964, Butts appeared with counsel before Honorable MARK E. LEFEVER, specially presiding, entered pleas of not guilty, and waived his right to jury trial. Before calling any witnesses, and with leave of court, the District Attorney entered a nol. pros. as to Bill No. 331 and as to the first count in Bill No. 329. Butts was adjudged guilty as to the second count in Bill No. 329, and as to the charge in Bill No. 330. Motions for a new trial and in arrest of judgment were refused by the court en banc, and sentences were imposed. These appeals followed.

A comprehensive review of the Commonwealth's testimony is set forth in the opinion below, and will be quoted in the paragraphs next following. So far as the defense was concerned, Butts did not take the stand

and the only testimony adduced was that of three character witnesses.

"Twenty-first Street is a one way street south. It is 26 feet wide, with a 12 foot east sidewalk. Delancey Place is 16 feet wide, with a 10 foot south sidewalk. On the east side of 21st Street, south of Delancy Place, were several parking meters and a City sign reading: 'Two-hour meter parking.' There were traffic signal lights at 21st and Spruce Streets and at 21st and Pine Streets, the streets immediately north and south of Delancey Place (a mid-block street) . . .

"There were no eye witnesses to the collision. However, Patricia Dolan, who lived on the third floor apartment of the building at the southeast corner of Delancey Place and 21st Street, testified that at about 5:50 P.M., that evening 'having been aware of a tremendous crash. I went to the window and I remember a body going up into the air and landing on the trunk of a car.' The defendant's 'black car . . . is the one that hit the Ford in the front.' She immediately notified the police by telephone.

"Police officers arrived at the scene of the accident a few moments later. The weather was dry and clear. It was 'getting dark' and the street lights were lit. Testimony of the officers and the photographs, which were admitted into evidence, indicate that the front of defendant's car was headed diagonally into the rear of the Ford in a southeasterly direction, with its front end 46 feet south of the south curb of Delancey Place; that its left front wheel was almost against the curb; and that two or three wheels of the Ford were pushed up over the curb onto the east sidewalk, between the parking meter and the sign. Defendant's car was badly smashed in front, particularly on the left front . . . The right rear of the Ford was damaged . . . The rear of the Chevrolet was damaged and it was pushed partly onto the sidewalk . . . There were no skid marks on

the street. The Dodge's engine was still running. The Ford and the Chevrolet were not occupied and their engines were not running. The inference is clear that no brakes were applied before the collision and that the parked Ford and Chevrolet were pushed onto the east sidewalk on 21st Street by the collision.

"Officer Placentra testified that he and Officer Lang arrived at the scene of the accident about 5:56 P.M.; that they found all cars at rest, and the defendant's engine was running; that the other engines were not running; that defendant was alone slumped in the front seat of his Dodge behind the wheel; that there was a strong odor of alcohol on defendant's breath; that defendant 'had a slight cut over his left eye'; and that defendant mumbled indistinctly in answer to questions. Officer Lang testified much the same. In addition, he testified that they received the radio call at 5:55 P.M., when their patrol car was between 20th and 21st Streets on Spruce Street, and they arrived at the scene one minute later.

"Officer Evans testified that he and Officer Daw arrived at 6:00 P.M.; that they observed defendant behind the wheel of his automobile; that an hour and a half later in the hospital there was 'a strong odor of alcohol on his breath'; that he was surly and belligerent; that they had 'to take him by the arms and take him out of the hospital', one officer on each arm; that 'I'd say he was drunk.' Officer Daw corroborated this testimony. He testified that in his opinion defendant was intoxicated.

"Officer Brooks testified that defendant was lying on the driver's seat of his car; that he had the odor of alcohol on his breath; that defendant was dazed and stuporous; that he had to help defendant out of his automobile into the police wagon; that one and a half hours later, in the hospital, defendant was belligerent, boisterous, mumbling and was still staggering; that he

had difficulty in standing up and difficulty in dressing—he was unable to button his underpants and trousers; and that he still had a heavy odor of alcohol on his breath. He kept repeating 'I didn't kill no ——— white boy.'

"Dr. Gilbert Fineman, police surgeon, testified that he examined defendant at 8:30 P.M., that evening. Defendant had a subnormal temperature of 97 degrees orally; 'he had an abnormally high pulse rate of 148 per minute'; his pupils were enlarged and fixed; there was a very strong odor of alcohol about him; his speech was slurred; his clothing was disarrayed; his coordination was poor and his station was swaying; his gait was unsteady and imbalanced; he was sullen. Defendant admitted to Dr. Fineman that 'he was intoxicated'. Dr. Fineman gave him the finger to nose test, the heel to toe test and the Rhomberg test; all were positive. On the basis of the foregoing, Dr. Fineman testified that it was his unequivocal opinion that defendant was then 'under the influence of intoxicating beverages and was unable to operate a motor vehicle.' Dr. Fineman was cross-examined as to the effect of the cut above defendant's left eye on his condition. The doctor answered that it had no effect on defendant's condition, and that it did not change his opinion that defendant was intoxicated.

"The deceased's father arrived at the scene between 5:30 P.M. and 6:00 P.M., to meet his son according to their usual arrangement, as the father was a carrier of newspapers for the Evening Bulletin and his son was his helper. It was customary for the father to meet the boy on the southeast corner of Delancey Place and 21st Street. On arrival the father found the boy lying face up 'stretched out like Christ on top of the car dead'. The father saw defendant—'He was there in the car and I thought he was sleeping behind the wheel' . . .

"Officer Hinchcliff of the Accident Investigation Squad arrived at the scene at 6:20 P.M. He found a brown mark on the front of defendant's automobile, which in his opinion came from the newspaper belt of the dead boy when the defendant's car struck him, and a black mark which in his opinion came from the boy's heel . . .

"Officer Hinchcliff interrogated defendant at Graduate Hospital, shortly after 7:00 P.M. Defendant, on being questioned about the accident, said: 'A. I don't know what happened. I must have blacked out or something. I just don't know what happened. Q. Which way were you traveling? A. I don't know. Q. Where were you coming from? A. I worked today. Q. Did you have anything to drink today? A. I had some wine, beer, and whiskey. Q. Where do you work? A. I work for the City at Craig and Rhawn. I worked until 4:30 today. I stopped four times to get my drinks.'

"Dr. James T. Weston, Assistant Medical Examiner of Philadelphia County, performed an autopsy upon decedent. He found a traumatic rupture of the spleen, perforation and hemorrhage of the small intestine, injury to the 5th and 6th cervical vertebrae, a broken neck and severe swelling of the brain. He also noted numerous abrasions, scratches and bruises of the right and left eyelids, left forehead, left cheek, left breast, left hip bone, left elbow, abdomen, back, left knee, right ankle and right leg. In the Examiner's opinion the injuries to the spinal cord, neck and brain caused instantaneous unconsciousness and paralysis, followed shortly thereafter by death".

In his extensive briefs appellant's resolute counsel advances seven contentions, two of which may be dismissed summarily, namely, that the respective findings of guilty were against the weight of the evidence. The test of the sufficiency of the evidence, irrespective of

whether it is direct or circumstantial, is whether, accepting as true all of the evidence upon which a verdict could properly have been based, it is sufficient to prove beyond a reasonable doubt that the defendant is guilty of the crime charged: *Commonwealth v. Frazier*, 411 Pa. 195, 191 A. 2d 369; *Commonwealth v. Fletcher*, 202 Pa. Superior Ct. 65, 195 A. 2d 177. We have carefully read the voluminous original record and there can be no doubt whatever that the evidence produced by the Commonwealth in the instant case passes the required test as to both charges.

It is first contended that the trial judge erred in permitting the introduction into evidence of a memorandum prepared by Dr. Fineman, and in permitting the doctor to testify concerning the examination when he admittedly had no independent recollection of it. Dr. Fineman made notes in his own handwriting at the time appellant was examined in the police station. The purpose of the examination was to determine whether or not appellant was under the influence of intoxicating liquor. Dr. Fineman stated that he had examined some 1500 persons between the date of the accident and the date of the trial and that he had no present independent recollection of this particular examination. We are in accord with the action of the trial judge.

Where a witness has no present recollection of a past event, even when aided by a memorandum made at the time, the memorandum itself may be offered in evidence, on testimony by the witness of his knowledge of its accuracy when made, and that it was made when the transaction was fresh in his mind: *Christian Moerlein Brewing Co. v. Rusch*, 272 Pa. 181, 116 A. 145; *Commonwealth v. Rush*, 277 Pa. 419, 121 A. 111; *Commonwealth v. Levi*, 44 Pa. Superior Ct. 253. Appellant relies upon *Commonwealth v. Roth*, 71 Pa. Superior Ct. 71, but examination of that case reveals that it actually supports our conclusion. The question of

refreshing recollection from memoranda and of past recollection recorded is discussed at length in *Kinsey v. State,* 49 Ariz. 201, 65 P. 2d 1141, and is the subject of an exhaustive annotation at 125 A.L.R. 19 et seq., from which we quote the following excerpt: "And it is now almost universally held both in England and the United States that upon the laying of a proper foundation, a witness may testify from a written memorandum though it does not recall the facts to his memory . . . Since a record of past recollection used by witness after verification becomes his 'present evidentiary statement', it is ordinarily held that even though it would not be evidence per se of its contents, it may be admitted in evidence in connection with his testimony, as part of his direct examination".

It is next contended that the trial judge erred in permitting improper cross-examination of one of appellant's character witnesses, Charles Haney, a fellow employe, who testified in chief that appellant had a fine reputation as a sober careful law-abiding citizen. For the purpose of questioning Haney's credibility, the district attorney developed on cross-examination, over objection, that Haney had been drinking with appellant and a friend after work on the afternoon of the accident. It is of course true, as appellant argues, that character may be discredited only by evidence of general reputation, and not by particular acts of misconduct: *Commonwealth v. Jones,* 280 Pa. 368, 124 A. 486; *Commonwealth v. Thomas,* 282 Pa. 20, 127 A. 427. Prejudicial questions which are obviously asked for the purpose of showing the commission of a specific crime or crimes for which the defendant is not presently accused do not constitute legitimate cross-examination: *Commonwealth v. Jenkins,* 413 Pa. 606, 198 A. 2d 497. However, the cross-examination in the instant case did not involve any specific crime or crimes for which appellant was not presently accused. It merely attacked

Haney's credibility by showing that he was actually one of appellant's drinking buddies, and that his standard of what constitutes good repute for sobriety was unsound. Cf. *Commonwealth v. Hurt,* 163 Pa. Superior Ct. 232, 60 A. 2d 828. As aptly stated in the opinion below:

"The credibility of every witness is always in issue. Credibility may be attacked by cross-examination. What could go more directly to the credibility of a witness who testified that defendant had an unimpeachable reputation for sobriety and peacefulness than the fact that this witness, and his friend, Corrie Warren, and defendant embarked on the drinking spree, which preceded and apparently led to this tragic accident now before the court. Certainly two people, i.e., the witness and the friend knew that defendant did not, or should not, have such reputation . . . In the instant case the challenged cross-examination dealt not with other crimes but with the specific conduct of defendant on the day in question and was directed to defendant's reputation for sobriety in the judgment of the witness and friend, Warren. It would seem that this was a proper attack on the credibility of the witness".

It is further contended that the trial judge erred in permitting the testimony of Officer Hinchcliff concerning his conversation with appellant at the hospital. The argument is made that appellant's statements to the officer were inadmissible because the Commonwealth had not proven the corpus delicti. While the law is well settled that an extrajudicial admission or confession by the accused may not be received in evidence unless and until the corpus delicti has first been established by independent proof, *Commonwealth v. Amato,* 148 Pa. Superior Ct. 151, 24 A. 2d 681, the accused's identity as the party responsible for the crime is not a constituent element of the cor-

pus delicti: *Commonwealth v. Turza,* 340 Pa. 128, 16 A. 2d 401. The corpus delicti may be proved by circumstantial evidence, and is accomplished by showing (1) a specific injury or loss, and (2) some person's criminality as the source thereof: *Commonwealth v. DuHadway,* 175 Pa. Superior Ct. 201, 103 A. 2d 489; *Commonwealth v. Frazier,* 411 Pa. 195, 191 A. 2d 369. In the instant case the testimony of the witnesses preceding Officer Hinchcliff clearly established that Romeo Minero was dead, and that his death was the result of an unlawful act. Cf. *Commonwealth v. Hartle,* 200 Pa. Superior Ct. 318, 188 A. 2d 798; *Commonwealth v. Gillum,* 202 Pa. Superior Ct. 370, 195 A. 2d 868; *Commonwealth v. Smoker,* 204 Pa. Superior Ct. 265, 203 A. 2d 358.

It is further contended as a separate argument that the Commonwealth failed to establish a causal connection between appellant's alleged unlawful act and the boy's death. See *Commonwealth v. Root,* 403 Pa. 571, 170 A. 2d 310. This contention is completely devoid of merit. It overlooks the testimony of Patricia Dolan that she heard a crash and saw the boy's body land on the car trunk, the testimony of the officers who arrived on the scene promptly and found appellant slumped over the steering wheel of his car with the engine running, and the testimony of Officer Hinchcliff concerning the marks on the front of appellant's car made by the newspaper belt and heel of the dead boy. While appellant attempts in his argument to bring a fourth car into the picture, there is no testimony or inference in the record to make this even a remote possibility.

It is contended finally that the trial judge erred in permitting the Commonwealth to show that the deceased boy was a careful person. The boy's father testified, over objection, that his son belonged to the St. Thomas Aquinas School Safety Patrol. The trial judge admitted the boy's membership card "to establish the

mens rea", and points out that no objection was made on this ground. Cf. *Commonwealth v. Raymond,* 412 Pa. 194, 194 A. 2d 150. Howbeit, there is a presumption that the deceased used due care, *Baker v. Pennsylvania R. R. Co.,* 369 Pa. 413, 85 A. 2d 416, and the record is barren of evidence to rebut this presumption. Appellant argues that "negligence of the deceased is not a defense and therefore the question of his care or lack of care is clearly irrelevant". Even if technically inadmissible, the objectionable evidence was mere surplusage. We perceive no prejudicial error.

The judgments are affirmed, and it is ordered that appellant appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with his sentences or any part thereof which had not been performed at the time the order of supersedeas was entered.