Commonwealth *v.* Clark, Appellant.

330

Argued November 16, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*F. Emmett Fitzpatrick, Jr.,* with him *Joseph Michael Smith,* and *Fitzpatrick & Smith,* for appellant.

*Maxine J. Stotland,* Assistant District Attorney, with her *Milton M. Stein,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, November 26, 1973:

On July 15, 1968, Officer Ross Brackett of the Philadelphia Police Department was shot to death when he pursued and attempted to arrest a suspect fleeing from the robbery of a Philadelphia trolley car. Appellant, Phillip Clark, was tried for this offense and found guilty of murder in the first degree. Following the denial of post-trial motions, Clark was sentenced to life imprisonment. This direct appeal followed.

Appellant urges three grounds for reversal. 1. insufficient evidence for conviction; 2. the improper introduction into evidence of an incriminating statement given by appellant to the police; 3. numerous prejudicial references during the trial to police photographs of Clark. For the reasons given below we find that these contentions lack merit. We consider them in the order presented by appellant.

1. The test of sufficiency of evidence is whether, accepting as true all the evidence, together with all reasonable inferences therefrom, upon which the jury could properly have based its verdict, such evidence and inferences are suffcient in law to prove guilt beyond a reasonable doubt. *Commonwealth v. Cimaszewski*, 447 Pa. 141, 288 A. 2d 805 (1971) ; *Commonwealth v. Cheatham*, 429 Pa. 198, 239 A. 2d 293 (1968) ; *Commonwealth v. Whiting*, 409 Pa. 492, 187 A. 2d 563 (1963). The Commonwealth presented some 45 witnesses and 38 exhibits during the course of the twelve day trial.[1] Through this evidence, the circumstances of the robbery and subsequent killing of Officer Brackett appeared as follows: At 8:30 a.m. on July 15, 1968, a trolley car stopped at an intersection in Philadelphia and was approached by a man in a blue shirt and light-

---

[1] No testimony or evidence was introduced on behalf of the defendant except at the penalty phase of the trial.

colored hat. The man reached through the operator's window and grabbed some $59 in rolled up change that was stored on the dashboard. The man fled and the conductor of the trolley (who later identified appellant as the thief) gave chase. A short distance down the street, the trolley operator spotted a police car, hailed it, and told the occupants what had happened. The policemen radioed to headquarters the occurrence of the robbery and a description of the thief, and set off in the direction taken by the robber. Some two blocks away, Officers Brackett and Hall were cruising in another police vehicle when they heard the flash message about the robbery. Shortly thereafter, they spotted a running man fitting the description of the thief and pursued him in their police wagon. During this time, the man was observed by a witness to throw a bundle (later found to contain money) into the street, which was quickly picked up by some small boys. The running man then darted into an alley and Officer Brackett took up the chase on foot, his partner meanwhile driving around the block to come into the alley from another direction. Brackett caught up with the suspected thief (identified as Clark by two witnesses) and attempted to handcuff him, but he broke away, taking Brackett's gun with him. The officer then followed Clark around a corner and was met by five shots from his own gun, the last one striking Brackett in the head, killing him instantly.

Clark was identified by photographs as the policeman's assailant by two witnesses on the same day as the killing. Brackett's revolver was later found in bushes near Clark's residence. Upon apprehension some four days after the crime, appellant admitted taking the money from the trolley car and throwing it into the street while running, but said nothing as to the shooting of Officer Brackett.

Appellant asserts that the above evidence of the Commonwealth does not rule out the possibility that the death of the policeman was a "pure accident" and that the identification testimony was "suspect". Both of these assertions fly in the face of an extensive record which details the two crimes and squarely implicates the appellant. The fact that some witnesses who had identified Clark a year and a half previously were unable to do so at trial, and that others who did identify him at trial might have been influenced by the appearance of Clark's photograph in the newspapers following the crime, does not mean that the jury must disregard this testimony; these were matters going to the weight of the evidence. The jury could have found the earlier identifications reliable and that the published photographs did not influence the other witnesses. Indeed, two identification witnesses had known Clark previously.[2] In short, there was ample evidence presented at trial from which the jury could find that Clark was not only the robber but also the killer of Officer Brackett, and that this killing was murder in the first degree.

2. Appellant's next contention is that he was improperly informed of his constitutional rights or that he should have been rewarned before he made an incriminating statement to the police, and that hence the introduction of that statement into evidence at trial was error.

This argument is based upon events which occurred when Clark was arrested and brought to the police sta-

---

[2] One of these witnesses, one James Dickerson, testified to having known appellant for some four or five years and identified Clark as the man he saw struggling with Officer Brackett. Upon being recalled to the stand several days later, he expressed doubt about his earlier identification. It is the prerogative of the jury to believe all, part or none of the testimony offered, of course, and they could therefore have believed Dickerson's earlier, more positive statements.

tion around 6:00 a.m., July 18, 1968. At 6:05 a.m. on that day, a detective informed appellant of his constitutional rights by reading from a card listing those rights as well as questions to determine whether they were understood. Those questions and the defendant's responses were: "Q. Do you understand that you have a right to keep quiet and do not have to say anything at all? A. Yes, I understand. Q. Do you understand that anything you say can and will be used against you? A. Yes. Q. Do you want to remain silent? A. I don't know. Q. Do you understand that you have a right to talk with a lawyer before we ask you any questions? A. Yes, I do. Q. Do you understand that if you cannot afford to hire a lawyer and you want one, we will not ask you any questions until a lawyer is appointed for you? A. I understand. Q. Do you want either to talk with a lawyer at this time or to have a lawyer with you while we ask you questions? A. I would like to talk with my mother. Q. Are you willing to answer questions of your own free will, without force or fear and without any threats or promises having been made to you? A. May I speak to my mother?" After this last response, the detective brought appellant's mother into the interview room and left them alone for half an hour. At 7:25 a.m., the detective returned to the room and again asked Clark: "Do you want to talk with a lawyer at this time or to have a lawyer with you while we ask you questions?" Instead of answering this question, Clark replied: "The only thing I want to say is that I was all alone on that morning during this incident, no one was with me. I threw the money away from the PTC while running down the street. I only—the only money I had was the three dollars I had before this all started. I took the PTC from that location and went to my girlfriend's house, 4128 Chester Avenue, changed my clothes and then took a cab downtown."

It is apparent that this oral statement of Clark was not the product of police interrogation or duplicity, but a voluntary utterance during an attempt by a police officer to determine whether an accused person who had been taken into custody effectively understood his rights. The earlier response to that same question was equivocal in that Clark had requested to see his mother; this request was granted. The repetition of the question as to whether a lawyer was wanted cannot be said to be "interrogation" without prior warning of constitutional rights, such as was condemned in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966); it was rather a further recognition of those rights, and preparatory to interrogation. We have defined "interrogation" under *Miranda* as including "any question likely to or expected to elicit a confession." *Commonwealth v. Simala*, 434 Pa. 219, 227, 252 A. 2d 575 (1969). The question which preceded the incriminating statement of Clark was clearly not of that sort, nor otherwise the product of compulsion. Cf. *Commonwealth v. Hamilton*, 445 Pa. 292, 285 A. 2d 172 (1971); *Commonwealth v. Bordner*, 432 Pa. 405, 247 A. 2d 612 (1968). The *Miranda* Court itself made it clear that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478. See also *Commonwealth v. Ross*, 452 Pa. 500, 307 A. 2d 898 (1973) and cases cited therein.

Appellant asserts that he was entitled to a full repetition of all his constitutional warnings after his visit with his mother, notwithstanding that less than an hour had elapsed since his rights had been explained to him. This is without merit. See, *inter alia, Commonwealth v. Hoss*, 445 Pa. 98, 112, 283 A. 2d 58 (1971); *Commonwealth v. Bennett*, 445 Pa. 8, 15, 282 A. 2d 276 (1971); *Commonwealth v. Abrams*, 443 Pa. 295, 299, 278 A. 2d 902 (1971).

3. Appellant's final contention is that the jury could infer from references to identification made through the use of photographs of appellant at the Police Administration Building by witnesses to the shooting that Clark had a prior criminal record. Reliance is placed on *Commonwealth v. Allen*, 448 Pa. 177, 292 A. 2d 373 (1972), wherein we held that such references are prejudicial and will result in reversal when the jury can reasonably conclude from the photographic evidence that the accused had been engaged in prior criminal activity. In *Allen*, however, counsel for defendant made timely objections and motions during the course of the trial to all references to the police photographs. In the case at bar, in contrast, no objections of any kind were made to the identification of the defendant through the use of photographs shown to witnesses by the police. Instead, appellant's counsel sought to capitalize on the fact that the police possessed photographs of Clark before his arrest in this case by trying to discredit the identification testimony of the Commonwealth's witnesses. Indeed, in the opening statement of appellant's counsel, made before any evidence had been heard, he brought to the attention of the jury that "there were posters all over the city with Phillip Clark's picture on it", and that at police headquarters there was "a poster with his picture on it".[3] Thus, he was the first to mention that the police were in possession of photographs of Clark. The Commonwealth sought to counter this strategy by eliciting from witnesses that they had identified Clark before pictures of him were published. Defense counsel acquiesed in all these references and even entered into stipulations as to the number of the photographs which had been identified by the witnesses. In cross-examination of identification witnesses, defense counsel pursued the point of

---

[3] P. 26, Notes of Testimony.

whether the witness had been exposed to newspaper or other pictures of Clark and if the police had used suggestive techniques in showing the witness a selection of photographs. This trial strategy, designed to cast doubt on the validity of the identification, did not succeed. The lower court was quite right in holding that "defendant cannot now complain that the pictures were used when he himself used them to exploit weakness in the Commonwealth's case." As we put it in *Commonwealth v. Raymond*, 412 Pa. 194, 194 A. 2d 150 (1963), "Generally, objections to evidence not entered at trial may not be urged on appeal or even at argument for a new trial below: [citations omitted]." 412 Pa. at 203. See also *Commonwealth v. Gordon*, 431 Pa. 512, 517, 246 A. 2d 325 (1968).

Judgment of sentence affirmed.