Commonwealth *v.* Grosso et al., Appellants.

Argued April 13, 1960.   Before RHODES, P. J., GUNTHER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ.

reargument refused July 27, 1960.

*Samuel Dash,* for appellants.

*Albert S. Oliensis,* for appellants.

*William Claney Smith,* Assistant District Attorney, with him *Edward C. Boyle,* District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, J., June 15, 1960:

These nine appeals are from judgments of sentence on certain charges of conspiracy and being concerned in the managing, conducting and carrying on of a lottery. In the light of the verdict, the facts are as follows:

In October 1958 Edmund Lovejoy, who lived on the Old Clairton Road in Jefferson Borough, was approached in a downtown tavern by Joseph Pino, one of the defendants, who asked Mr. Lovejoy if he had a garage for rent. Mr. Lovejoy agreed to rent the garage in the basement of his house to Joseph Pino for $25.00 per month. In addition to the use of the garage, Mr. Pino was also given permission to use the basement area. Shortly after the garage was rented Mrs. Ruth Lovejoy received a telephone call to have the garage doors open at 9:00 o'clock in the morning and at 2:30 o'clock in the afternoon. Between October 1958 and February 19, 1959 she received calls on 15 different occasions requesting her to have the garage doors open. These calls were received the night before the doors were to be opened. After the doors were opened in the morning a station wagon would drive into the garage. Mrs. Lovejoy, on a number of occasions, saw one of the defendants, Cornelius Harrington, get out of the station wagon and carry cases or boxes into the base-

ment. The station wagon, which was owned by Cornelius Harrington, would leave the premises in the morning and return at approximately 2:30 o'clock in the afternoon. After the station wagon entered the garage in the afternoon Mrs. Lovejoy heard sounds coming from the basement, which she thought were made by adding machines, until approximately 7:30 o'clock in the evening. The defendant, Joseph Pino, would come up from the basement and hand Mrs. Lovejoy a paper bag containing money which she was instructed to turn over to her husband. Between February 5, 1959 and February 19, 1959, at approximately 2:30 p.m., the members of the Racket Squad of the City of Pittsburgh observed all of the defendants, except Cornelius Harrington, at the Bill Green Parking lot on Penna. Highway Route No. 51 getting into the station wagon and driving toward the Lovejoy home. On a number of occasions they saw Joseph Carmen Grosso, Gerald Grosso, Charles Cheetham and Gen Attanasio park their cars at the Bill Green Parking lot and go over to the station wagon, carrying brown paper bags. They would then enter the station wagon and drive to the Lovejoy residence.

On February 17, 1959 Officer John Nee, who was parked in the Bill Green Parking lot, saw the station wagon hereinbefore referred to, which was being driven by Anthony Bruno, pull into the parking lot and park about 2:30 o'clock in the afternoon. He saw Gen Attanasio, one of the defendants, enter the station wagon and then he saw Gerald Grosso get out of his car, which was parked in the parking area, carrying two brown paper bags and one white paper bag. He walked over to the station wagon and deposited the three paper bags inside. He then went back to his automobile, picked up a notebook and two other books, and came back to the station wagon. The books, as described by Officer Nee, were "the large school type."

He entered the station wagon and the station wagon then left the parking area. Officer Nee followed it to the Lovejoy home, where it entered the garage in the basement.

After keeping the Lovejoy house under surveillance from February 5 to February 19, the Racket Squad obtained a search warrant and entered the Lovejoy house at approximately 2:30 p.m. on February 19. They found a complete numbers headquarters in full operation in the basement of the Lovejoy house. Joseph Pino was hiding in a bedroom on the first floor, Lillian Alberts, Gen Attanasio, Charles Cheetham, Jennie Gatto, Joseph Carmen Grosso, Jack Sandman and Mary Robinson were all in the basement sitting at tables, in front of adding machines. During the raid Sam Grosso and Gerald Grosso ran from the house but they were apprehended by police officers stationed on the outside of the house. In addition to the adding machines, tables, rubber bands, paper clips and coin wrappers, the officers found thousands of numbers slips in the basement. There were 17 bags of numbers slips dated February 9, which contained 3,549 individual slips, with a total play of $14,922.86. There were 785 slips for February 10, 1959, with a play of $2,249.08; there were 88 packs for February 11, 1959, containing 13,159 slips, with a total play of $39,241.74; there were 81 packs for February 12, containing 12,054 slips, with a total play of $27,500.02. There were 80 packs for February 13, containing 14,205 slips, with a total play of $44,608.71; there were 80 packs for February 14, containing 11,185 slips, for a total play of $34,371.91; there were 95 packs for February 16, containing 14,928 slips with a total play of $68,752.77; there were 108 packs for February 17, containing 13,266 slips, with a total play of $39,963.16; for February 18 there were 109 packs containing 13,833 slips with a total play of $40,353.20. On the day of the raid, February 19, there

was a total play of $86,608.87, and the total play from the 9th of February to the 19th was $398,572.71.

In addition to the numbers slips, the officers found two books in the basement which Officer Leo Flynn, who had made a study of the numbers racket in Allegheny County, testified were kept by the contact men to keep the records of the amount played with each numbers writer. There was either a code number or a name on the top of each page of these books signifying the code number or the first name of the numbers writer. The following named defendants were arrested, indicted and convicted for operating a lottery and conspiracy to operate a lottery on February 19: Sam Grosso, Lillian Alberts alias Lillian Miller, Gen Attanasio, Charles Cheetham, Gerald Grosso, Joseph Carmen Grosso, Joseph Pino alias Joseph Pollock, Mary Robinson alias Mary Giamp, Jack Sandman and Cornelius Harrington alias Neil Harrington alias Neil Hamilton. Edmund Lovejoy and his wife, Ruth Lovejoy, who lived in the house where the headquarters was located, were indicted, together with their son, Ronald, but were not tried with the other defendants. Jennie Gatto was also indicted in connection with the February 19 operation but her case was continued because of illness.

On April 20, 1959, while Sam Grosso, Joseph Carmen Grosso, Gen Attanasio and Jack Sandman were still under indictment for the February 19 operation, they were again arrested, with Anthony Bruno, for conspiracy and being concerned in the operation of a lottery. At 1:15 p.m. on April 20 Officer Leo Flynn was driving south on the Liberty Bridge when he saw Joseph Carmen Grosso driving north. Officer Flynn then made a U-turn on the bridge and began following Joseph Carmen Grosso, who drove to the Oakland district of Pittsburgh and pulled into a gas station. He then drove out of the gas station and parked in front

of the Strand Theater. He left his car and Officer Flynn noticed he was carrying a brown paper bag. He approached a car parked nearby at the corner of Forbes and Atwood Streets and handed the bag in through an open rear window. Joseph Carmen Grosso then walked over to his Cadillac automobile and drove to the Medical Arts Parking Garage, where he left his car. After leaving the Medical Arts Parking Garage, he walked over and entered the DeSota sedan, which was the same car in which he deposited the brown paper bag a few minutes before. Officer Flynn, who had been joined by Officer Walsh of the Pittsburgh Police Department, followed the car to Bellefield Avenue, where the car was stopped. After the car was stopped the police officers observed that Anthony Bruno was driving the car, Sam Grosso was sitting in the front seat next to the driver, Joseph Carmen Grosso, Gen Attanasio and Jack Sandman were all sitting in the back seat. The car was searched and there was a brown paper bag under a newspaper in the back seat containing two books similar to those seized in the numbers headquarters on February 19. They also found in the brown paper bag adding machine tapes. Officer Flynn testified that these tapes were weekly tapes. Each tape bore a name at the bottom, such as "Edie-X," "Bob," "Gene," "Sam," "Judy," "Buttons," "Mom." The two books which were seized on April 20 contained the names or code numbers for the numbers writers which were shown on the tapes and the names or code numbers on the tapes and the two books seized on April 20 correspond with the names or code numbers in the books that were confiscated on February 19 in Jefferson Borough. In the books seized on April 20 the figures to show how much money was played are missing, indicating to this extent that the books were not complete.

Counsel for Anthony Bruno complains as to the trial of his client at the same time and with the defendants on the charges arising out of the Jefferson Borough raid on February 19, 1959. While it is true that Bruno was not found in the headquarters at the time of the February 19 raid, two days before, on February 17, 1959, he was seen driving the headquarters station wagon to the headquarters, having in the station wagon Gen Attanasio and Gerald Grosso, and also having in it two brown paper bags and one white paper bag. Bruno drove the station wagon from the Bill Green Parking lot, which was the accustomed meeting place for the conspirators, to the headquarters. Bruno was not indicted for the February 19 episode but the evidence was sufficient to have sustained such an indictment. This evidence, in our opinion, was sufficient to connect Bruno with that enterprise. In *Com. v. Russo,* 177 Pa. Superior Ct. 470, 478, 479, 111 A. 2d 359, we said: "It is the settled rule that the consolidation of indictments charging separate and distinct offenses is largely a matter within the sound discretion of the trial judge and where the indictments are closely related his exercise of discretion will not be reversed unless it is clearly shown that an appellant has been prejudiced thereby. Commonwealth v. Lehman, 166 Pa. Superior Ct. 181, 70 A. 2d 404; Commonwealth v. Kaysier, 166 Pa. Superior Ct. 369, 71 A. 2d 846; Commonwealth v. Schultz, 168 Pa. Superior Ct. 435, 79 A. 2d 109. And under the modern practice related felonies and misdemeanors may be consolidated for trial before the same jury. Here there was positive testimony before the committing magistrate of the solicitation of sodomy, as against testimony so softened before the grand jury as to fail to make out a prima facie case against any of the sex offenders charged with crime. The consolidation was especially appropriate in these cases for the proofs followed the same

pattern and were all interrelated. Evidence establishing the charge of obstructing public justice in each of the cases against a defendant would be admissible in the trial of all of the others to show that the acts were intentional and wilful, not accidental; to prove motive; to show a plan, design or scheme, and a common purpose and to rebut any inference of mistake. Goersen v. Commonwealth, 99 Pa. 388; Commonwealth v. Chalfa et al., 313 Pa. 175, 169 A. 564."

In Wharton's Criminal Procedure, Vol. 5 §1943, p. 50, it is stated: "The court may order consolidation for trial of indictments in which defendants are charged with crimes of the same class, which are so connected that evidence at the trial of one will be admissible at the trial of others." In *Com. v. Kloiber*, 378 Pa. 412, 415, 106 A. 2d 820, it was said: "Especially is a joint trial permissible, if not advisable, when the crimes charged grew out of the same acts and much of the same evidence is necessary or applicable to both defendants: . . ." In *Com. v. Zwierzelewski*, 177 Pa. Superior Ct. 141, 152, 110 A. 2d 757, we said: "Evidence of acts done in furtherance of the common design was admissible against all participants." See also *Com. v. Morrison*, 180 Pa. Superior Ct. 133, 118 A. 2d 263; *Com. v. Giambrone*, 183 Pa. Superior Ct. 283, 130 A. 2d 254; *Com. v. Nestor*, 183 Pa. Superior Ct. 350, 132 A. 2d 369.

The defendant Bruno, with the other four co-defendants arrested in the Jefferson raid, had met together, apparently by prearrangement, all having in their possession parking stubs for the same garage. This was exactly the modus operandi followed prior to the Jefferson raid, where they customarily met in a central location before proceeding to the headquarters. The evidence in the Jefferson Borough case was admissible in the case arising out of the April 20 arrests

for the purpose of showing a plan, design or scheme, and a common purpose. The direct evidence of Bruno's participation in the Jefferson Borough operation was admissible to show his complicity in the plan, scheme, design and common purpose in relation to the April 20 arrests. This evidence was also admissible to show the "motive" of the April 20 meeting and that this meeting was not "accidental," and to rebut any inference of mistake in relation to the meeting. The evidence of the coded books and coded tapes in the Jefferson raid was admissible for the same reasons to show their relationship to the similar books and tapes confiscated on April 20. This was evidence of a plan, design or scheme. It was evidence to show that a continuous numbers operation was in effect. It had not been terminated by the raid conducted on February 19. We are, therefore, of the opinion that Bruno was not prejudiced by the trial of his case with those arising out of the February 19 raid.

It is also argued by counsel for Charles Cheetham, Lillian Alberts, Joseph Pino and Cornelius Harrington, that the trial of the cases which arose from the April 20 incident with those that arose out of the February 19 raid prejudiced these defendants. It must be remembered that Joseph Carmen Grosso, Sam Grosso, Gen Attanasio and Jack Sandman, 4 of the 5 persons involved in the April 20 incident, were also involved in the February 19 raid. These four persons, together with the four defendants, Charles Cheetham, Lillian Alberts, Joseph Pino and Cornelius Harrington, were all indicted on a conspiracy indictment arising out of the February 19 incident. Especially is a joint trial permissible, if not advisable, when the crimes charged grow out of the same acts and much of the same evidence is applicable to the defendants. Where, as here, the indictments are closely related, such consolidation will not furnish grounds for reversal unless the de-

fendants have been prejudiced thereby. In reality, the original conspiracy to confederate together and operate a numbers game continued from a time prior to the February 19 raid down to and including the April 20 arrests. There were, however, separate substantive offenses on February 19 and April 20. We are of the opinion that none of the defendants were prejudiced by the consolidation of these cases for trial.

It is also argued by counsel for Joseph Carmen Grosso, Anthony Bruno and Sam Grosso that the evidence relating to the April 20 arrests was insufficient to support a conviction. Counsel relies strongly upon the case of *Com. v. Marino*, 142 Pa. Superior Ct. 327, 16 A. 2d 314. In that case we held that the evidence was not sufficient to sustain a conviction of operating a lottery where the only evidence against Marino was that he was a passenger in a car operated by someone else and a bag of numbers was found concealed under the back seat. Marino testified that he had no knowledge of the operation and that he had just accepted the offer of a ride with the driver. None of the defendants in the cases arising out of the April 20 arrests took the stand in their own defense and, therefore, no explanation was given to show why they were present in the car. The mere presence of the defendants in the car was not the only evidence showing their relationship and complicity in the operation of the lottery. Nearly all of the evidence offered in the Jefferson Borough case was admissible in the April 20 case to show the plan, design, scheme and common purpose of the defendants. This evidence also established the motive in the meeting of the defendants on April 20. While it is true that Bruno was not indicted for the February 19 case, he could have been. Furthermore, he was the driver of the vehicle involved in the April 20 arrests.

It has also been argued that the books and tapes found in the car on April 20 concerned the same trans-

action as those found in the February 19 raid and that therefore Joseph Carmen Grosso and Sam Grosso may not be sentenced a second time for the same offense. Where a person is found guilty of two separate crimes which arise out of the same transaction he can be sentenced only upon the more serious crime: *Com. v. Soudani*, 398 Pa. 546, 159 A. 2d 687. The books and tapes found in the car on April 20 were similar to those taken in the February 19 raid but they were not the same books and same tapes. The specific dates to which the material found April 20 applied did not appear. It seems to us, however, that the April 20 material did not apply to the same time as the February 19 material. Since the April 20 material did not reveal the specific dates to which it was applicable, it could fairly be assumed that it applied to current operations and not to those existing on and before February 19. The same conspiracy undoubtedly continued but the substantive offenses were different and separate. One conspiracy might cover a year with substantive offenses occurring on each separate day thereof. The defendants could not be carrying around the books and tapes applicable to the February 19 raid because all of those books and tapes had been seized by the officers. It is fairly clear from this evidence that the defendants had prepared new books for the same numbers writers and for the purpose of carrying on the numbers operation after the February 19 raid. Joseph Carmen Grosso and Sam Grosso could, therefore, be sentenced for a second substantive offense occurring on April 20. They were not sentenced for any substantive offense occurring on February 19. The sentences growing out of the February 19 raid were upon the conspiracy charge only. Anthony Bruno was sentenced only upon the conspiracy charge growing out of the April 20 arrests. He had not been indicted nor was he sentenced for anything growing out of the February

19 raid. The action of the court below, therefore, did not violate the principle of law that a person found guilty of two separate crimes which arise out of the same transaction can be sentenced only upon the more serious crime.

Counsel for Joseph Carmen Grosso and Sam Grosso also argue that it was illegal for the court below to sentence them on the third count of the indictment arising out of the April 20 arrests. This argument is based upon the fact that the jury slips sent out with the jury were returned by the jury, indicating a guilty verdict on the first count of conspiracy and on the second count of lottery. In charging the jury the court said: "Now, the first count in that indictment is conspiracy. If you find the defendants did conspire together to set up this lottery, then they would be guilty of conspiracy, and you would write after that count, 'We find the defendants guilty.' If you find they did not conspire together to set up this lottery you would write after the first count in that indictment, 'We find the defendants not guilty.'

"If you find some of them guilty and some of them not guilty, you would signify which ones were guilty of conspiracy and which ones weren't guilty of conspiracy after that count.

"Then you would pass to the second count of lottery. If you find that the defendants named in that indictment were guilty of setting up, operating a lottery, you would write after the second count concerning that particular indictment, 'We find the defendants guilty,' and, of course, if you find that they did not set up or were concerned with the operation of a lottery on April 20, you would write after the second count, 'We find the defendants not guilty.'

"If you find some of them set up such a lottery, or concerned with the operation of such lottery, you would

find them guilty, and if you find the rest of them had nothing to do with setting up a lottery or being concerned with a lottery, you would find them not guilty."

We believe that the jury, under this charge, intended to return a verdict of guilty not only on the conspiracy charged contained in the first count of the indictment but also on the second and third counts of the indictment charging respectively setting up a lottery and being concerned in the operation of a lottery. Be that as it may, the record shows that the verdict was actually recorded as a general guilty verdict on all counts of indictment No. 128 June Sessions, 1959 applicable to the April 20 arrests. The court, in imposing sentence upon the third count of the indictment, clearly intended to sentence on the charge of being concerned in the operation of a lottery. The verdict having been recorded as a general verdict, the court could have sentenced upon any of the counts of the indictment. A written memorandum of findings of a jury, although filed and preserved, is not part of the record. The only verdict is that which the jury announces orally and which is received and recorded as the jury's findings: *Rottmund v. Penna. R.R. Co.*, 225 Pa. 410, 416, 74 A. 341; *Com. v. Houghton*, 22 Pa. Superior Ct. 52, 54; *Henning v. Keiper*, 37 Pa. Superior Ct. 488, 491. We are, therefore, of the opinion that the court below did not err in sentencing Joseph Carmen Grosso and Sam Grosso on the third count of the indictment.

Judgments of sentence affirmed and it is ordered that appellants appear in the court below at such time as they may there be called and that they be by that court committed until they have complied with the sentences or any part thereof which had not been performed at the time the order of supersedeas was entered.

GUNTHER, J., dissents as to Anthony Bruno.