Commonwealth *v.* Bruno et al., Appellants.

542

544

Argued April 13, 1964. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Harold Gondelman,* with him *Louis C. Glasso,* for appellants.

*William Claney Smith,* Assistant District Attorney, with him *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MONTGOMERY, J., June 11, 1964:

These appeals by the defendants below from judgments of sentence following verdicts of guilty are based on the following indictments, identified by the number assigned to them at the 1961 January Session of the Quarter Sessions Court of Allegheny County:

(545) O. B. Bruno—seven counts of extortion and one of misdemeanor in office during 1958.

(546) O. B. Bruno and Orest Panza—extortion in 1958.

(547) William Neff—twelve counts of extortion in 1957.

(548) William Neff—eight counts of extortion and one count of misdemeanor in office in 1958.

(549) William Neff and Sam Ianuzzi—eight counts of extortion and one of misdemeanor in office in 1956.

(551) Stephen Zielinski—eight counts of extortion and one of misdemeanor in office in 1958.

The appellants were councilmen of the Borough of Sharpsburg, Allegheny County, when they allegedly committed the crimes charged aforesaid. The charges arose from transactions relating to the delivery of coal to the borough power plant under its contracts with Frank Panza.

Motions to quash the indictments were refused prior to trial and appeals from such actions were taken to this Court; but they were quashed as interlocutory. The same questions sought to be raised in those appeals are now before us and will be discussed initially. Appellants contend the indictments should have been

quashed because (1) they were not returned at the
next term of court following the preliminary hearing;
(2) the informations on which they were based fail to
set forth the exact dates of the alleged acts of extor-
tion and the precise amounts of money extorted; and
(3) the informations on which they were predicated
were signed by a private prosecutor on information re-
ceived, without stating that he believed the facts to be
true to the best of his knowledge.

(1) The court did not err in refusing to quash the
indictments on the ground that they had not been re-
turned at the next term of court following the prelimi-
nary hearing before the committing magistrate. The
informations were dated September 19, 1960, and the
preliminary hearing was held September 29, 1960. The
committing magistrate sent them to the district attor-
ney promptly; but they were not presented to a grand
jury until that of January, 1961, which returned the
indictments. Appellants contend that they were de-
nied a substantial right, viz., the right to challenge the
array of the January, 1961 grand jury, since they did
not have notice of the fact that it was to consider the
matters. However, they made no effort to challenge
the array of the grand jury prior to trial, and they
have not set forth in what manner they have been
prejudiced. This same argument has been advanced
under similar circumstances in other cases and has
been rejected. It has been advanced in cases where the
indictments were returned by a grand jury in session
at the time of the transmission of the informations by
the committing magistrate (a pending grand jury).
*Commonwealth v. Bozzi,* 178 Pa. Superior Ct. 224, 116
A. 2d 290 (1955); *Commonwealth v. Magid and Dick-
stein,* 91 Pa. Superior Ct. 513 (1927). It also has been
considered in cases where grand jury action was post-
poned and the indictments were returned by a subse-
quent grand jury. *Commonwealth v. Gross,* 161 Pa.

Superior Ct. 613, 56 A. 2d 303 (1948); *Commonwealth v. Weiner,* 101 Pa. Superior Ct. 295 (1930). In some of those cases the fact of notice to the defendants of when their cases were to be considered by the grand jury was disputed. However, lack of notice has been held not to be prejudicial in itself because the defendant is privileged to challenge the array and formation of the grand jury at any time until a plea is entered or a jury sworn. *Commonwealth v. Gross,* supra. Therefore, in the present case, in the absence of any prejudice being shown and any attempt being made to challenge the array of the January, 1961 grand jury, we also must hold this contention to be without merit.

(2) Appellants complain further that the informations on which the indictments were found were insufficient in that they contained blanks in relation to the precise amounts of money allegedly extorted and the precise dates on which they received the illegal payments. The informations charge that the defendants received money "in regular monthly payments beginning in .............., 1956, and continuing thereafter up to and including October 1958." Regardless of the omissions in the informations, the appellants entered bail for their appearances in court after they had had a preliminary hearing, and they did not object in any way to the preliminary proceedings until after they had been indicted. Therefore, they must be held to have waived any irregularities in the proceedings before the committing magistrate and cannot thereafter complain of the inadequacy of the informations. See *Commonwealth v. Evans,* 190 Pa. Superior Ct. 179, 154 A. 2d 57 (1959), affirmed 399 Pa. 387, 160 A. 2d 407 (1960), cert. denied, 364 U.S. 899, 81 S. Ct. 233, 5 L. Ed. 2d 194, rehearing denied, 364 U.S. 939, 81 S. Ct. 377, 5 L. Ed. 2d 371; *Commonwealth v. Fudeman,* 50 Berks 142, quashed on appeal at 186 Pa. Superior Ct. 547, 142 A. 2d 473 (1958), affirmed 396 Pa. 236, 152

A. 2d 428, cert. denied, 361 U.S. 902, 80 S. Ct. 211, 4 L. Ed. 2d 157. See also *Commonwealth v. Murawski,* 101 Pa. Superior Ct. 430 (1931). Although an information must contain the essential elements of the offense sought to be charged, because the defendant should not be required to answer a charge different from and unrelated to the one for which he was arrested and held on bail, it need not set forth the charge with the same particularity and so fully and specifically as the indictment. *Commonwealth v. Musto,* 348 Pa. 300, 35 A. 2d 307 (1944); *Commonwealth v. Cortes,* 182 Pa. Superior Ct. 602, 128 A. 2d 155 (1956); *Commonwealth v. Gross,* supra. The indictments are explicit in stating the amounts of money extorted and the dates on which the acts of extortion were committed; it is only the informations that do not so state. Furthermore, the hearing before the committing magistrate would have supplied this information.

(3) While the law is as contended by the appellants, that one who swears to an information on information received from others must also swear that he believes the information that he received, after a hearing and the posting of bond it is too late to question the information on that basis; and after indictment it is certainly too late. *Commonwealth v. Hunsicker,* 189 Pa. Superior Ct. 63, 149 A. 2d 584 (1959); *Commonwealth v. Weinstein,* 177 Pa. Superior Ct. 1, 109 A. 2d 235 (1954); *Commonwealth v. Murawski,* supra. The *Hunsicker* case, page 66, states, "These defendants when bound over to court might have raised the question of sufficiency, or the total lack of the evidence to hold them, on habeas corpus, but having given bail they can be discharged, before trial, for lack of evidence only by the grand jury."

The appellants contend that this defect in the information is jurisdictional and that the arrest was, therefore, in violation of art. I, §8, of the Constitution

of Pennsylvania and cite *Commonwealth v. Wiggins,* 54 Lanc. Rev. 11 (1954), in support thereof. In that case the defendant, who was prosecuted before a justice of the peace for reckless driving, had waived a hearing and had given bail. The court quashed the information and stated that the failure to swear that a charge based upon information received is believed by the affiant is a jurisdictional and not a procedural irregularity, which may be raised after a waived hearing. Neither the court in that case nor the appellants delineated what aspect of jurisdiction was involved. However, regardless of the illegality of the arrest, including complete absence of an information and a defective information, the committing magistrate and subsequently the court have jurisdiction over the person of the defendant. *Commonwealth ex rel. DiDio v. Baldi,* 176 Pa. Superior Ct. 119, 106 A. 2d 910 (1954). Even though a defective information is subject to review on a question of jurisdiction of the case or subject matter if brought in timely fashion, an indictment found regularly upon examination of witnesses will operate to correct any jurisdictional, as well as procedural, defects and irregularities in the information, warrant and proceedings before a magistrate. *Commonwealth v. Brennan,* 193 Pa. 567, 44 A. 498 (1899). Furthermore, it is well settled that the defects and irregularities in the information, warrant and proceedings aforesaid are waived by pleading to the indictment and going to trial. *Commonwealth ex rel. Lockhart v. Myers,* 193 Pa. Superior Ct. 531, 165 A. 2d 400 (1960), cert. denied, 368 U.S. 860, 82 S. Ct. 102, 7 L. Ed. 2d 57. None of the cases cited by appellants conflict with these principles. In *Commonwealth v. Imboden,* 6 Lebanon County Legal Journal 180 (1957), and *Commonwealth v. Wiggins,* supra, the informations were attacked prior to indictment. *Commonwealth v. Hockenberry,* 72 Pa. D. & C. 274 (1950), and *Com-*

*monwealth v. Webber,* 95 P.L.J. 272 (1946), involved summary convictions for vehicle code violations and held that convictions based on defective informations in those circumstances were subject to attack at any time. Thus, in those cases no grand jury proceedings were involved. *Commonwealth v. Deppen,* 52 Pa. D. & C. 442 (1944), is illustrative of the principle that the regular grand jury proceedings cure a defective information.

Therefore, we conclude that this contention also is without merit.

## Facts

The facts on which the verdicts of guilty were predicated may be succinctly stated as follows: Each year the contract for supplying coal was advertised by the Borough of Sharpsburg for public bids. In March, 1956, Frank Panza, having submitted a bid, which was determined to be the lowest responsible offer, was awarded the contract. Payments for amounts due under the contract were made monthly, beginning in April and continuing through November of that year, when a new contract was made. Payments were made only after samples of the coal had been tested. The tests were made by taking samples from each load as delivered, placing them in a can, mixing and grinding them, and submitting the resulting combined sample to the Pittsburgh Testing Laboratory. If the test measured up to the established standard, payment was made; and if not, a penalty might be imposed. It was possible to tamper with the samples and to alter them so as to make it appear that the coal was inferior in character. Defendants Neff and Ianuzzi (Iannuzzi, Iannuzi) advised and threatened Panza to the effect that, if he did not favor them by way of kickbacks in the sum of twenty-five cents per ton, which was one

half of his profits, that his payments would be held up and penalties would be imposed. Responding to that threat, Panza delivered a sum of money in four different envelopes to Ianuzzi's cleaning establishment each month; and on some occasions delivered them personally to Ianuzzi or Neff.

In November, 1956, Frank Panza was awarded a new contract; and the same threat by Ianuzzi and Neff was made, resulting in similar payments during the year 1957. Although Ianuzzi was not indicted for extortion during 1957, it was established that he received certain sums of money each month at his place of business and that that money was delivered in four envelopes for Neff and himself and two other persons, later identified as Orest Panza and Zielinski, defendants.

In November, 1957, another new contract was entered into between the borough and Panza. Panza continued to make such payments and, beginning in February, 1958, he began to make payments to Bruno.[1] These payments to Bruno, Neff, Zielinski and Ianuzzi continued until August of 1958. A false analysis of Panza's coal for the month of December, 1958, after he had stopped payments, showed that it was inferior to specifications; and a penalty of $3,800 was imposed on him. When he complained and the matter of this penalty was brought before the council publicly, Orest Panza and Bruno advised him that they would secure the payment of the entire contract price (thus securing a waiver or return of the penalty) but that he would be required to pay them $350 each. Orest Panza and Bruno advised Panza that they could do this be-

[1] The payments of twenty-five cents a ton were always divided into four parts. It is not clear at times which of the five named defendants may not have received a part. However, each received a part at sometime during the periods covered by the several indictments.

cause of their official position as councilmen. In response to this suggestion Panza did pay each of them $350.

In establishing the facts, the Commonwealth offered evidence of a witness Kaminski who testified that prior to 1956, as a broker, he had negotiated a contract between the Borough of Sharpsburg and Raymond Kutsch for delivery of coal to the borough for the purposes of the power plant, and that Kutsch had allowed him a brokerage fee of forty cents a ton, from which he paid Neff and Bruno, during the life of this contract, monthly sums of money under the threat that unless payments were made the analysis of the coal would be tampered with and penalties would be imposed. Kaminski also testified that during this period he had called Bruno and Neff on several occasions and talked with them about the payment of this money in avoidance of a penalty, and that during these conversations he, Kaminski, had held near the receiver of his telephone a microphone which was attached to a tape recording machine. This tape recording was offered in evidence and heard by the jury. Appellants complain that the admission of this evidence of Kaminski, including his testimony as to his prior relationship with Neff and Bruno, as well as the tape recording, was error. Further, when this evidence was offered before the jury, counsel for Orest Panza, Zielinski, and Ianuzzi asked the court for a severance of their cases from that of Neff and Bruno, which motion was refused. This is also contended as being in error and prejudicial. Although all of these cases were consolidated for trial and involved different defendants, there had been no previous request for a severance.

Generally, evidence of distinct crimes not connected with those charged in the indictment on trial cannot be received. However, evidence of offenses other than the one charged in the indictment is admissible when

such evidence shows motive, plan, design and scheme or common purpose previously conceived and in part executed. *Commonwealth v. Ross,* 413 Pa. 35, 195 A. 2d 81 (1963).

We have no difficulty with the conclusion that the evidence disclosed the common purpose, design, and scheme on the part of Bruno and Neff to secure money from various contractors dealing with the Borough of Sharpsburg in the supplying of coal, and that such scheme was executed to some extent. However, such scheme, during the time Kaminski was involved with the contractor, did not involve the other defendants, Ianuzzi, Orest Panza and Zielinski. Although the record of testimony has not been printed, we have examined the original record and note that when the testimony of Kaminski was received it was expressly limited in its effect to the charges against Neff and Bruno. The jury was expressly told that it was to have no effect or bearing on the indictments against the other defendants.[2] Likewise, in the charge of the court, the

[2] "MR. GONDELMAN: If the Court please, at this time I ask that any testimony of this witness concerning a conversation with O. B. Bruno be limited to the defendant, and that the jury be instructed now that they cannot apply [it] to any other defendant.

"THE COURT: That is correct. You heard what Mr. Gondelman said. Of course, any statement made by Mr. O. B. Bruno would not be evidence against any other defendant in itself, only be evidence against him, that is, Bruno." (Original record, pages 416, 417)

"MR. GONDELMAN: Pardon me, Mr. Schmitt, but I object to the statement what the others were getting as applying to these defendants as being hearsay.

"THE COURT: It certainly is objectionable so far as applying to any defendants in this case because it cannot be evidence against them, but I think he does have the right to state, when he says there might have been others without certainly indicating who they were, because certainly it would be no evidence whatsoever, proper evidence, against any person excepting Mr. Bruno himself. But as to his reason here, I think you can show that without it

jury was similarly instructed.[3]

Under the circumstances, we conclude that the other defendants were not prejudiced to such an extent as to warrant the grant of a new trial for this reason. See *Commonwealth v. Silia,* 194 Pa. Superior Ct. 291, 166 A. 2d 73 (1960) ; *Commonwealth v. Grosso,* 192 Pa. Superior Ct. 513, 162 A. 2d 421 (1960).

The same objections were made to the offer of the recording made by Kaminski as were made to his oral testimony, viz., (1) it was prejudicial to the other defendants, Ianuzzi, Zielinski, and Orest Panza; (2) it did not pose a separate and distinct crime which might establish a common plan, purpose, or design.

We need not repeat our previous discussion in relation to the testimony of Kaminski. It was limited to Neff and Bruno, as was the recording.

Although a distinct crime cannot be given in evidence against a defendant who is being tried for another crime, except under certain special circumstances, we have not seen a case which holds that the earlier crime must be identical in character with the later one. What is meant by special circumstances is expressed in *Commonwealth v. Burdell,* 380 Pa. 43, 110 A. 2d 193 (1955), page 47: "It is held that such evidence is admissible only where the former alleged crime or crimes are of the same nature as the one under trial and indicate a general intent or design on the part of the accused to conduct, for example, a series of similar robberies, or murders, or sex offenses, or poisonings of

being evidence against any of the other defendants in this case. I think you have a right to state that. We will overrule the objection to that extent. Now go ahead. Allow an exception and go ahead now." (Original record, pages 418, 419)

[3] "I emphasize that this evidence is only introduced against two of these defendants, Orest Panza [Neff (subsequently corrected by the court)] and O. B. Bruno, and you must not consider it as against any of the others, it is not evidence at all against them." (Original record, page 1118)

persons in order to obtain their insurance money, or the like; in other words, the prior criminal act or acts are evidential only if clearly constituting part of a chain, system, composite plan or scheme." It is noted that the statement does not use the word identical, but similar. In that case, extortion and robbery were held not to be similar. However, see *Commonwealth v. Morrison*, 266 Pa. 223, 109 A. 878 (1920); *Commonwealth v. Bufalini*, 200 Pa. Superior Ct. 85, 186 A. 2d 645 (1962); *Commonwealth v. Grosso, supra*.

We are of the opinion that the acts of Neff and Bruno in 1955 fall within the rule as to what constitutes "special circumstances" making such evidence admissible.

As to the other reason, appellants contend that the testimony of Kaminski and Kutsch, as well as the recording, related to a contract other than the ones on which the defendants were indicted and that any payments made by Kaminski to Neff and Bruno from money received from Kutsch were not received by Neff and Bruno under color of office. Therefore, they argue, proof of such payments did not show a course of conduct similar to that for which appellants were being tried, namely, for extortion by color of office. We fail to see the nice distinction urged by the appellants. Whether Neff or Bruno, councilmen of Sharpsburg Borough, accepted illegal payments directly from Kutsch, who was the contractor, or from Kaminski, who was the broker who had negotiated that contract, the payments were made and received in connection with a matter in which the Borough of Sharpsburg was interested, its contract for coal. Appellants argue that if any pay-offs were made, Kutsch had no knowledge of them. We, likewise, fail to see the importance of this fact. If Neff and Bruno, as councilmen, extorted money from Kaminski which he had received from Kutsch for negotiating the contract for the lat-

ter, the effect of the action of Neff and Bruno was to demand and accept money under threat of interfering with that contract, to the detriment of both Kutsch and Kaminski. Of course, it was a contract other than the ones on which these indictments were predicated. Nevertheless, it involved the same subject matter—the supplying of coal to the borough.

Nor do we find any merit in appellants' contention that the recording of the telephone conversation between Kaminski and Neff and Bruno was erroneously admitted into evidence. Telephone conversations generally are admissible if there is proper identification of the voice. *Limestone Products and Supply Company v. Tom Brown, Inc.*, 198 Pa. Superior Ct. 375, 181 A. 2d 696 (1962). This was not an interception of a message as intended by the Act of July 16, 1957, P. L. 956, §1, 15 P.S. §2443. *Commonwealth v. Smith*, 186 Pa. Superior Ct. 89, 140 A. 2d 347 (1958). It was the recording of a message by the rightful receiver of it, free from any restrictions as to divulgence. The United States Supreme Court has held that it is proper to admit in evidence wire recordings made under similar circumstances, *Lopez v. United States*, 373 U.S. 427, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963), and telephone conversations, heard by third parties with the consent of the originally intended receiver, *Rathbun v. United States*, 355 U.S. 107, 78 S. Ct. 161, 2 L. Ed. 2d 134 (1957). See *Rayson v. United States*, 238 F. 2d 160 (1956), for a situation identical with our present one.

We do not deem it necessary to rule on the P.U.C. regulation requiring a "beep" signal when telephone conversations are recorded.[4] A similar regulation of

---

[4] "E. Connection with Customer-Owned Voice Recording Equipment.

"1. Regulations.

"A. General

the F.C.C. was ignored in the *Rathbun* case. Furthermore, prior to *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), the admissibility of evidence was not affected by the means by which it was secured.[5] *Mapp* dictated the adoption of the exclu-

"Customer-owned voice recording equipment for the recording of telephone conversation may be used in connection with the telephone lines, except coin box telephone lines, of the Telephone Company subject to the following conditions:

"(1) *Connection with Telephone Company Facilities*

"(a) Connection of customer-owned voice recording equipment with the facilities of the telephone company shall be made only *through recorder connector equipment which contains a recorder tone device automatically producing a distinctive* recorder tone that is repeated at intervals of approximately fifteen seconds when the recorder equipment is in use, *except that, in the case of telephone lines which have no connection with the exchange or toll system of the Telephone Company, recorder connector equipment which does not contain the automatic tone device may be used at the option of the customer.* [Emphasis supplied.]

"(b) Permanent connection shall be made only through recorder connector equipment furnished, installed, and maintained by the Telephone Company.

"(c) Connection may be made through portable recorder connector equipment provided such equipment is obtained from and is maintained by the Telephone Company. The portable recorder connector equipment shall be connected with the telephone line through jacks installed by the telephone company on each line or at each station used for recording purposes, except that where recording is done at a cord switchboard, a portable jack box supplied and maintained by the Telephone Company may be used.

"(d) The customer-owned voice recording equipment shall be so arranged that at the will of the user it can be physically connected to and disconnected from the facilities of the Telephone Company or switched on and off." Local General Tariffs, Pennsylvania, Public Utilities Commission No. 1, Section 26, Sheets 19 and 20.

[5] *Commonwealth ex rel. Williams v. Myers*, 193 Pa. Superior Ct. 110, 162 A. 2d 419 (1960), cert. denied, 364 U.S. 924, 81 S. Ct. 290 5 L. Ed. 2d 263; *Commonwealth v. Voci*, 185 Pa. Superior Ct. 563, 138 A. 2d 232 (1958), affirmed 393 Pa. 404, 143 A. 2d 652, cert. denied; 358 U.S. 885, 79 S. Ct. 119, 3 L. Ed. 2d 113; *Commonwealth*

sionary rule for states if there had been a violation of a constitutional right in the procuring of the evidence. We see no such right involved in a violation of a rule of the Pennsylvania Public Utility Commission, if the situation in the present case should be considered such a violation. The regulation appears to be more for the benefit of the telephone company than for the parties to the conversation.

## Severance

The consolidation or separation of indictments is a matter for the trial judges, whose conclusion will be reversed only for obvious abuse of discretion or prejudice to the defendant. *Commonwealth ex rel. Bolish v. Banmiller,* 396 Pa. 129, 151 A. 2d 480 (1959); *Commonwealth ex rel. Lockhart v. Myers,* supra. Furthermore, a motion for severance made after the trial has proceeded and the testimony of several witnesses has been taken is untimely. *Commonwealth v. Flaherty,* 167 Pa. Superior Ct. 19, 74 A. 2d 506 (1950); *Commonwealth v. Dugan,* 167 Pa. Superior Ct. 22, 74 A. 2d 508 (1950). The court did not abuse its discretion in refusing a severance in this case and adequately protected the rights of those defendants not referred to in the testimony of Kaminski or his recording, as previously discussed.

Sufficiency of Evidence to Convict Defendants of Statutory Extortion Under Act of June 24, 1939, P. L. 872, §318, 18 P.S. §4318—or of Common-Law Offense of Misdemeanor in Office

Defendants contend that evidence is lacking to prove that they took money from Panza under color of

*ex rel. Koffel v. Myers,* 184 Pa. Superior Ct. 270, 133 A. 2d 570 (1957), cert. denied, 355 U.S. 918, 78 S. Ct. 349, 2 L. Ed. 2d 278;

their office. They argue that since the contracts had been legally awarded, the councilmen had no further power to interfere with them and, therefore, could not have committed the crime of statutory extortion. Although they deny that they had access to the coal samples or an opportunity to tamper with them and that the matter of analysis was entirely in the hands of the Pittsburgh Testing Laboratory, an independent agency, we find in the record evidence to the contrary. Mr. Panza testified that he had delivered premium coal to the borough and that inferior coal samples had been substituted for the premium coal samples before the analysis was made by the Pittsburgh Testing Laboratory, which resulted in penalties of over $3,800 being imposed on him. There is also evidence that Panza, in talking to the defendants at various times about the analysis of the coal, was told that they could make it rough on him if he did not divide his profit with them. From this evidence the jury could have found that the defendants did have some control over and access to the samples of coal used for the analysis.

However, of equal or greater importance in the disposition of this issue is the fact that the monthly bills submitted by Panza were subject to approval for payment by defendants, who also had control over the matter of imposition of penalties. Although penalties of over $3,800 were imposed as a result of the false analysis, this was refunded to Panza by action of the council after he had agreed to pay $700 to Orest Panza and Bruno, two members of that council. Contrary to appellants' argument, it is difficult for us not to conclude that the payments received by them from Panza were made because of the influence they had as mem-

Commonwealth v. Chaitt, 176 Pa. Superior Ct. 318, 107 A. 2d 214 (1954), affirmed 380 Pa. 532, 112 A. 2d 379, cert. denied, 350 U.S. 829, 76 S. Ct. 59, 100 L. Ed. 740.

bers of the borough council and that they were received by them under color of that office.

Although the office of councilman does not involve the payment or receipt of fees, this is unimportant since the statute covers situations wherein a public officer takes fees or rewards *not allowed by law* as well as the taking of more benefits *than is allowed by law.*

It is not contended that councilmen are not such public officers who may be guilty of this crime or that the evidence is not sufficient to prove payments made to them. Therefore, since we are satisfied that each of the defendants received the payments "by color of his office", we reject their contention and hold it to be without merit. *Commonwealth v. Channing,* 55 Pa. Superior Ct. 510 (1914), relied on by appellants, is not to the contrary. In fact, it may be cited in support of our conclusion since it defines, at page 516, an act done "by color of his office" as "a pretense of official right to do an act, made by one who has no such right; the use of official authority as a pretext or cover for the commission of some corrupt or vicious act; an act wrongfully done by an officer under the pretended authority of his office:". The acts of these defendants are covered by those definitions.

Finally, appellants contend that the common-law crime of misdemeanor in office insofar as borough councilmen are concerned has been abrogated by The Borough Code, Act of May 4, 1927, P. L. 519, art. XIII.I, §1317, added July 10, 1947, P. L. 1621, §42, 53 P.S. §46317, which makes it a misdemeanor for such offenses to be interested directly or indirectly in any contract for materials or labor furnished the borough. In support of this argument appellants cite *Commonwealth v. Peoples,* 345 Pa. 576, 28 A. 2d 792 (1942), wherein city councilmen passed a resolution fixing the salaries of its members of the Chester Municipal Authority to which they had previously elected themselves

members. In that case our Supreme Court said, page 579, "The law is clear that misfeasance in office means either the breach of a positive statutory duty or the performance by a public official of a discretionary act with an improper or corrupt motive: McNair's Petition, 324 Pa. 48; Commonwealth v. Hubbs (No. 2), 137 Pa. Superior Ct. 244. Such offense is not indictable under the common law, however, 'where a remedy is provided or duty enjoined, or anything directed to be done by the penal provisions of any act of assembly', unless necessary 'for carrying such act into effect': Penal Code, Act of June 24, 1939, P. L. 872, section 1104."

Although defendants are not charged with being directly interested in the contracts for the supplying of coal, they are charged with extortionately demanding from Panza fees and rewards based on the tonnage of such material furnished with the knowledge that Panza had been officially awarded such contract.

The Commonwealth argues that the aforesaid code provision means that the official must not be interested in the contract itself, as distinguished from the profits realized from same by the supplier after it has been performed by him. Arguing further, it contends that the prohibition relates to the act of voting on such contracts. This nice distinction is not acceptable. By the illicit arrangement with Panza, defendants become interested in each new contract made with Panza for supplying coal. Furthermore, they were interested in the proceeds at the time they approved his bills for payment. Whether their arrangement with Panza was legal or illegal would not be material. In *Commonwealth ex rel. v. Elliott*, 291 Pa. 98, 139 A. 626 (1927), a borough councilman who worked for the one who had contracted for the borough was held within the prohibition of the statute of May 28, 1907, P. L. 262. Although that statute specifically covered employees of

contracting parties who were also officials and the present statute excludes them if they disclose their relationship and do not vote, these defendants did not bring themselves within that exclusion. See also *Commonwealth ex rel. Whitehouse v. Harris,* 248 Pa. 570, 94 A. 251 (1915).

We conclude that the appellants were subject to the penalties imposed by the Act of June 24, 1939, P. L. 872, and for that reason were not guilty of the common-law offense.

The judgments of sentence against all appellants are affirmed on all charges of extortion; but the judgments are reversed as to all appellants on the charge of misdemeanor in office and they are discharged from same.

It is further ordered that the appellants appear before the court below at such time as that court may call them and that they be committed by that court until they have complied with their sentences on the charges of extortion or any part thereof which had not been performed at the time these appeals were made a supersedeas.