Commonwealth *v.* Winters, Appellant.

Argued November 17, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*J. Lauson Cashdollar*, with him *Luce, Good, Tosh and Associates*, for appellant.

*Joseph M. Stanichak*, Assistant District Attorney, and *Joseph S. Walko*, District Attorney, submitted a brief for Commonwealth, appellee.

OPINION BY HOFFMAN, J., March 29, 1976:

Appellant, convicted of unlawful delivery of a controlled substance,[1] raises two contentions: (1) that the evidence was insufficient to sustain the jury's finding of guilt; and (2) that the trial court relied on facts *de hors* the record in imposing sentence.

On August 1, 1974, police conducted a drug raid in the "Ropes" area of Marion Township, Beaver County. Appellant was searched and released at that time. Three of appellant's associates, however, were arrested and eventually indicted. Based on statements by the three accomplices,[2] appellant was arrested on August 26, 1974, and was charged with the unlawful delivery of a controlled substance to Robert Johnston, Kevin Roberts, and Clayton Schlereth. After two days of testimony, on December 11, 1974, a jury found appellant guilty as charged. After the court *en banc* denied appellant's post-trial motions, the trial court sentenced appellant to a term of imprisonment of eighteen months to five years. This appeal followed.

The Commonwealth presented five witnesses — two members of the county sheriff's office who acted as undercover agents and the three accomplices. Appellant's argument is based, in part, on inconsistencies in the testimony of the witnesses.

George Yaccich, a Deputy Sheriff for Beaver County, stated that on August 1, 1974, he and two other deputies

---

1. The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P.L. 233, No. 64, §13, as amended; 35 P.S. §780-113(a)(30) (Supp. 1975-76).

2. All three witnesses were charged with various offenses arising from the events of August 1, 1974. All three, however, had engaged in plea bargaining and were testifying with the understanding that certain of the charges would be nolle prossed.

were involved in a drug investigation of the "Ropes" area, where young people congregated. Shortly after the three deputies arrived, they were approached by an unidentified juvenile who offered to sell them some L.S.D. Deputy Cogan accompanied the youth to a van parked nearby and purchased three "lids"[3] of the ·drug. Kevin Roberts then approached the deputies with an offer to sell them marijuana. They agreed to purchase $40.00 worth of marijuana. Roberts and Johnston drove off in an unsuccessful effort to secure the marijuana.

The deputies were joined by Clayton Schlereth and appellant. When Roberts and Johnston returned without any marijuana, appellant said that he knew where to get some. Appellant, Schlereth, Roberts, and Johnston drove off again in Johnston's van. About two hours later, the four young men came back to the "Ropes" area. According to Yaccich, Deputy Cogan received two ounces of marijuana from either Johnston or Roberts.

Thereafter, the deputies arrested the four young men. A search of Johnston's van uncovered two additional "bags" of marijuana. After the search, Roberts, Schlereth, and Johnston were formally arrested; appellant, however, was released. Some time after the initial arrests, all three young men implicated the appellant; Yaccich, therefore, swore out a criminal complaint charging appellant with unlawful delivery and arrested him on August 26, 1974.

Johnston testified that on August 1, he, Schlereth, and a third friend not involved in the case, rode to the "Ropes" area to go swimming. He gave an account of the incident different from that presented by the deputy:

"Q. Did you have occasion to talk with Officer Yaccich or the other sheriff deputies?

"A. No, sir.

"Q. Did you come in contact with them at all?

"A. Only Officer Cogan. He came over to the van and said hi and that was it.

---

3. A "lid" was defined by the deputy as one dose of the drug.

"Q. Who was at the van at that time?

"A. Me and Kevin Roberts.

"Q. Did you have occasion to see this Defendant John Winters on that day?

"A. It was about 3:30, 4:00 after he had gotten off work from Flame Harding.

"Q. Where did you see him?

"A. At the Ropes.

"Q. At your van?

"A. At different occasions, yes. See, he was on foot and I wouldn't get out of the van. But he did come out of my van and then he had gone back over to where Mr. Yaccich and the other police were.

"Q. Well, did you have occasion to drive Winters anywhere that day?

"A. Yes, sir. I drove him down to Bridgewater ....

"Q. Where did you take Winters?

"A. Well, we went down Bridgewater and we drove up to Brady's Run Park and then we went back down into Bridgewater and we drove around for a while and he stopped off — he wanted to stop at a trailer and we stopped there.

"Q. Do you know who owned the trailer?

"A. No, I don't ....

"Q. Did he leave the van — your van?

"A. Yes, he did.

"Q. Did he have anything — was he carrying anything?

"A. When he left? No ....

"Q. He left the trailer?

"A. Yes.

"Q. Where did he go?

"A. He come back into my van.

"Q. Was he carrying anything when he came into the van?

"A. Yes, sir. A paper bag.

"Q. What kind of paper bag?

"A. Like a shopping bag ....

"Q. Did you know what was in the bag?

"A. No, I did not.

"Q. Did he bring the bag into the trailer — I mean into your van?

"A. Yes, sir.

"Q. Did you ask him what was in it?

"A. No, sir ....

"Q. What occurred when you went back to the Ropes?

"A. Well, we went back to the Ropes. I went over — first thing I did was got out of the van. It's the first time I'd been out of the van. Then Kevin Roberts got his money back off the officer, Officer Cogan and then John Winters gave Officer Cogan two ounces or — well, he gave him the grass. I don't know the exact amount."

Thus, Johnston attempted to deny all knowledge of the drug transaction and to implicate appellant alone.

Schlereth also implicated appellant as the supplier of the marijuana:

"Q. Did anyone leave the van when you stopped at this trailer?

"A. Yes.

"Q. Who?

"A. John. John Winters.

"Q. Did anyone else leave the van?

"A. No.

"Q. Where did he go?

"A. He went into the trailer.

"Q. Was he carrying anything when he went into the trailer?

. . . .

"Q. Your answer was no?

"A. Correct ....

"Q. When he emerged from the trailer was he carrying anything?

"A. I couldn't say. I didn't see ....

"Q. Where did you go from there ....

"A. We went back to the Ropes from there, I'm pretty

sure. My memory on exact details is a little hazy because I was very quite drunk at the time ....

"Q. Do you recall any of the events that occurred after you went back to the Ropes?

"A. Yes, I do.

"Q. Tell us what occurred.

"A. When we went back to the Ropes I got out of the van and was looking at the swimmers and just moseying about and I overheard a few conversations, this and that and the other thing and I saw John Winters hand over two bags of marijuana to Patrick Cogan, Officer Cogan."

Deputy Cogan, however, supported Deputy Yaccich's version of the incident. He testified concerning the purchase of L.S.D. from Roberts and Johnston, their attempt at locating some marijuana, and the final purchase of marijuana. He testified that Roberts and Johnston, not appellant, transacted the sale of the marijuana:

"A. ... I saw Mr. Roberts get out of the van, Mr. Johnston and Mr. Schlereth that I could actually identify at that time. I approached Mr. Roberts, gave him the money. He then looked in the direction of Mr. Johnston and said, 'Give the man his grass.' He went around to the side of the van. At that time Mr. Johnston handed me the grass from behind the passenger's seat on the top of an old Army coat and at that time is when I first saw the Defendant, John Winters.

"Q. Was he in the van?

"A. He was right there beside the double doors, open doors.

"Q. You say you got the grass from whom?

"A. Mr. Johnston."

Finally, Roberts, as did his two associates, attempted to depict appellant as the prime mover in the drug transaction. He testified that during the trip to Bridgewater, appellant stopped at a trailer, but that "I didn't notice him carrying anything until he got back to the place of the arrest." At that time, however, "[h]e had a brown paper bag."

"Q. Well, did you see where he got the bag?

"A. No, I didn't.

"Q. Well, how do you know he had a brown paper bag?

"A. Well, when I got out of the van when we returned, I saw him carrying it.

"Q. You saw Winters carrying it?

"A. Yes.

"Q. From where to where?

"A. Just outside the van."

Further, Roberts claimed that appellant gave the marijuana to Deputy Cogan: "Q. Did you observe Johnston or Winters or anybody else pass any marijuana to any of the policemen that were there?

"A. I saw Mr. Winters give Cogan two ounces of marijuana."

Appellant challenges the sufficiency of the evidence. The relevant legal principle is easily stated: In determining the sufficiency of the evidence, this Court must accept as true all the evidence, with all reasonable inferences therefrom, upon which the fact-finder could properly have based its verdict. *Commonwealth v. Clark*, 454 Pa. 329, 331, 311 A.2d 910 (1973). At the same time, such inferences cannot be based on mere suspicion or speculation. *Commonwealth v. Simpson*, 436 Pa. 459, 260 A. 2d 751 (1970).

The basis of appellant's claim is that the three witnesses were inherently incredible because their testimony was in direct conflict with that offered by the two deputies. All three attempted to exonerate themselves by denying that they knew what was in the brown bag or that appellant obtained the marijuana for them to deliver it to the deputies.

Initially, appellant was indicted for delivery to Roberts, Johnston, and Schlereth, not to the deputies. The appellant does not dispute that Roberts delivered the marijuana to Cogan. Therefore, it is clear that someone

delivered the marijuana to Roberts. The Commonwealth thus had to depend on the testimony of Roberts, Johnston, and Schlereth to establish how Roberts obtained the marijuana. Although all three denied that they ever possessed the marijuana, they unequivocally stated that they had no marijuana on August 1, a fact corroborated by Yaccich's testimony, and that at some point during their travels, appellant acquired a brown paper bag containing marijuana. Thus, viewed most favorably to the verdict winner, the Commonwealth proved that early in the day, Roberts and Johnston were unable to procure any marijuana, that appellant told Cogan that he could supply him with marijuana, that appellant entered a trailer and returned with a brown paper bag, that Roberts, at some later point, was in possession of marijuana, and that immediately upon the group's return from the trip to the trailer, the deputies found a brown paper bag containing marijuana in Johnston's van. The chain is complete. Although it is obvious from the record that the three witnesses attempted to exonerate themselves, appellant does not contend that their testimony was therefore inadmissible, but rather that it was unworthy of belief. The court correctly charged the jury that "if you find that any of the witnesses have testified falsely in any way, you may reject all of that witness' testimony which you determine is false and accept, of course, that portion which you conclude and determine is true." Thus, the issue of the witnesses's credibility was properly before the jury and was resolved against the appellant. We cannot now overturn that finding.

Appellant also contends that the trial court relied on facts not of record in determining appellant's sentence.

Prior to sentencing, the court made the following statements: "As we read that record the Defendant here is not a mere seller, not a mere seller out on the street making sales here and there wherever possible. He is part of the distribution system .... We are satisfied that

the evidence in this case discloses that not only did he deliver marijuana but he held a position in the distribution system higher than that of a mere seller."

The judge also stated that, subsequent to appellant's trial, he had presided at the trial of John and Kathy Glaab, who were found guilty of possession of a controlled substance (marijuana) with intent to deliver. The Glaabs indicated that they had been framed by the appellant. During the sentencing hearing, despite counsel's protests, the judge made clear that he considered this evidence relevant to his decision. He then sentenced appellant to a term of five years' imprisonment, the maximum penalty for delivery of a controlled substance.

The facts of the instant case are analogous to those in *Commonwealth v. Kulp*, 235 Pa. Superior Ct. 397, 344 A. 2d 602 (1975). We remanded for resentencing in *Kulp* because of the following colloquy:

"[Defense counsel]: ...there is no reason, I believe, to doubt that the sale took place pretty, as such took place pretty much as Mr. Kulp described it. [sic].

"By the Court: This particular sale did, but he was dealing in traffic, which I must keep in mind.

"[By defense counsel]: I don't think there is any indication of that.

"By the Court: Except he did make a sale and there is no indication it is the only sale he ever made .... The Court might state that I had two or three [other trials] last week, sales from the same station ...." 235 Pa. Superior Ct. at 400-401, 344 A.2d at 603-04. Similarly, appellant was tried for the delivery of marijuana to Roberts, Johnston, and Schlereth; there was no proof of appellant's participation in drug traffic generally. Further, the court improperly relied on testimony presented at the Glaab trial. Appellant had no way of challenging such obviously self-serving declarations intended to shift criminal liability from the Glaabs to appellant. Cf., *Wood v. Tucker*, 231 Pa. Superior Ct. 461,

332 A. 2d 191 (1974).

Therefore, we must remand for resentencing.

DISSENTING OPINION BY PRICE, J.:

I agree with the majority that the instant case is analogous to *Commonwealth v. Kulp*, 235 Pa. Superior Ct. 397, 344 A.2d 602 (1975);[1] therefore, for the reasons stated in my dissent in the *Kulp* case, *supra*, I would conclude the sentencing court's remarks here before us concerning appellant being a part of "the distribution system" were not improper. The majority concludes that the sentencing judge improperly relied on facts not of record in determining appellant's sentence. I most strongly disagree with that conclusion. Indeed, upon this record, that was exactly the offense for which appellant was charged and convicted of in this jury trial. The trial judge was exactly correct when he said at the sentencing: "We are satisfied that the evidence in this case discloses that not only did he deliver marijuana but he held a position in the distribution system higher than that of a mere seller. He is a part of the distribution system. We believe the evidence discloses that and the jury has concluded that and was warranted in doing so."

The facts, taken as we must, in the light most favorable to the verdict-winner clearly established, as the jury found, that appellant secured these drugs from a central supply point, sold them to either Johnston or Roberts, who in turn sold them to the deputy.

The majority also concludes that the sentencing judge improperly relied on testimony presented at the trial of John and Kathy Glaab and their claim that they had been framed by appellant. My interpretation of the sentencing transcript does not support that conclusion. At a time when appellant was on the stand during the

---

1. On November 26, 1975, the Supreme Court of Pennsylvania granted an allowance of appeal per curiam in *Commonwealth v. Kulp*, 235 Pa. Superior Ct. 397, 344 A.2d 602 (1975).

sentencing hearing and the pre-sentence report was under discussion, the following occurred:

"THE COURT: He says in that report that he was framed. Do you have any idea who framed you?

A. Well, the way I look at it is that these three guys turned me in. They testified against me and I don't know if — in my opinion they weren't sufficient witnesses. They turned me in and I was given — when I went down to the sheriff's office when they picked me up, they give me no choice about the statement that I had to make and everything, either to go to jail or do this and at the time I was off work and I wanted to get to work and I was waiting on this job. If I had gone to jail I would have missed out on the job.

THE COURT: I don't know what statement you are talking about. You didn't testify at this trial —

MR. CASHDOLLAR: May it please the Court.

THE COURT: Both of you quit interrupting me. We went through this at the trial. There was no statement of yours introduced against you at the trial. The only reason I ask who framed you is that the interesting thing about it is that is the same defense the Glaabs raised and of course it was the Glaabs that you got the stuff from that you delivered to the sheriff's deputies and it is interesting to me that everybody in this outfit claims when they are caught and convicted, they have been framed. I just wondered who you said framed you.

A. No, you misunderstood what I said then. I didn't say that I was framed by the Glaabs or whatever. But these three guys for no reason at all turn around and a month later turn around and say that I'm the one that gave it and they were busted with it and I wasn't and they turned around and made the accusations against me. It was told to me and my mother will testify, too because it was asked of her if I was an informer.

MR. CASHDOLLAR: May it please the Court. I had intended to avoid this area since a jury determination had been made. But since Your Honor has inquired into it I feel compelled to enter the area. With the District Attorney's permission I would like the Court to examine a copy of the statement that Mr. Winters gave the sheriff's office and now I will tell the Court again with the permission from the District Attorney, that I advised Mr. Winters not to take the stand primarily on the basis of this document.

THE COURT: Mr. Cashdollar, I'm not being critical of him not taking the stand. That was his right. I explained that to the jury and I'm not being critical. It was just interesting to me that the evidence in this case was that he got the stuff from the Glaabs. I tried the Glaabs, too. They said they were framed. He said to the investigator from the Parole Board that he was framed. I was just interested in knowing who he said framed him because his name came up in their trial when there was talk about framing.

MR. CASHDOLLAR: Your Honor, once again —

THE COURT: That's all. I'm not being critical of anybody for not testifying. I'm not concerned about what statements he made. I don't care to know what statement he made because they weren't in the trial. Unless there is something you feel will help him in this sentence proceedings there is no need to go into it.

MR. CASHDOLLAR: Well, Your Honor, I feel compelled to go into it because of the Court's remarks. I would like to introduce the statement. I'll say merely that this statement does indicate that Mr. Winters was present and that Mr. Winters told the individual where they could purchase marijuana. I believe that Mr. Winters feeling that he was framed is based on the testimony of the three Commonwealth

witnesses that they indicated that he was the individual who purchased the things and that he then gave them to those three individuals. They also testified that John Winters himself sold the marijuana to the deputy sheriffs and that was not in keeping with what the deputy sheriffs said. Mr. Winters feels that he was not guilty of the crime specifically charged in the indictment. I am not sure that he understands completely the nature of his involvement, his legal involvement with what occurred based on his statement. I believe that would possibly make him an accomplice and I believe he said he was framed — that's what he was speaking of. I would hate for the Court to consider him in the same light as a number of protestations that were made here by earlier Defendants and that's all I have to say on that point, Your Honor.

THE COURT: I don't understand what you mean. I'm not going to sentence him for what somebody else did. I'm going to sentence him for what he did, that the jury concluded he did in this case and that's all. He has been found guilty of unlawful delivery to undercover sheriff deputies of a quantity of marijuana.

MR. CASHDOLLAR: I understand.

THE COURT: Not to the deputies, I'm sorry, to the people who sold it and then to the deputies. He is charged with having gone to the Glaabs, obtained a quantity of marijuana and in turn delivering it to the individual who in turn sold it to the deputies and that's all he will be sentenced for. That's what the jury said he did.

MR. CASHDOLLAR: I just want the Court to understand his state of mind. I didn't want the Court to be misinformed as to the state of mind which I thought the Court might consider.

THE COURT: I was concerned about who he thought framed him and I understand now that he says the fellows he delivered the marijuana to —

MR. CASHDOLLAR: That's not what he says, Your Honor. He said he did not deliver it.

THE COURT: I understand that, too. But the people he is said to have delivered it to and the people who the jury have concluded he delivered it to framed him in his opinion.

MR. CASHDOLLAR: Yes, Your Honor. I have no further questions."

It is obvious that this issue was raised by appellant's claim that he was framed. The sentencing judge was entitled to clarification as to that claim, but it is to me obvious that the discussion above quoted does not demonstrate that the lower court improperly relied on testimony presented at the Glaab trial.

For these reasons I must again dissent for I regard the majority view as an unwarranted intrusion into the traditional discretionary domain of the sentencing court, and, as such, a further step on the road to disaster in the administration of our system of justice.

The majority finds no merit in appellant's other allegations of error and to that extent I concur.

I would affirm the judgment of sentence.

WATKINS, P.J., and VAN DER VOORT, J., join in this dissenting opinion.